IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ERNEST MATTISON,

                                                    Civil Action No.
                              Plaintiff,            9:10-CV-0504 (GLS/DEP)

                v.


JOSEPH DECKER, Correctional Officer/
Corporal, Ulster County Jail; TYRONE
BRODHEAD, Correctional Officer, Ulster
County Jail; JOHN LEGG, Correctional Officer,
Ulster County Jail; and E.P. CUNNINGHAM,
Correctional Officer, Ulster County Jail,

                              Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

ERNEST MATTISON, *Pro se*
09-A-3287
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

FOR DEFENDANTS:

COOK, NETTER LAW FIRM               ERIC M. KURTZ, ESQ.
P.O. Box 3939                       ROBERT D. COOK, ESQ.
85 Main St.
Kingston, New York 12402


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Ernest Mattison, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  In his complaint, plaintiff maintains that while incarcerated in a local jail facility he was assaulted by the four named defendants.  Plaintiff asserts that by their actions the defendants violated his rights under the Eighth Amendment.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint.  In their motion defendants argue that no reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated in connection with the incident in question, despite his claims to the contrary.  Having reviewed the record now before the court, considered in a light most favorable to the plaintiff, I find that the case will ultimately turn upon resolution of credibility issues, which are not appropriately determined on a summary judgment motion, and I therefore recommend that defendants' motion be denied.

I.    <u>BACKGROUND</u>[1]

_____

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply

Plaintiff is currently a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and designated to the Green Haven Correctional Facility, located in Stormville, New York.  Complaint (Dkt. No. 1) § 2; *see also* Dkt. No. 32.  At the times relevant to his complaint, however, plaintiff was an inmate at the Ulster County Jail ("Ulster"), located in Kingston, New York.  Complaint (Dkt. No. 1) § 3.

Plaintiff's claims stem from an incident occurring on July 27, 2008 at Ulster while jail officials attempted to transfer Mattison from his C-Pod cell to H-Pod to serve a thirty-day sentence of keeplock confinement resulting from a disciplinary hearing.  Complaint (Dkt. No. 1) § 6; Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 4; Brodhead Aff. (Dkt. No. 38-1, Exh. E) ¶ 4; Legg Aff. (Dkt. No. 38-1, Exh. F) ¶ 3.  The parties generally agree that on that date each of the four named defendants, Corrections Corporal Joseph Decker and Corrections Officers Tyrone Brodhead, John Legg, and E.P. Cunningham, was involved in some way in events leading up to the transfer.  *See id.*  It is at this point that the parties' versions of the relevant events diverge.

---

contested by the defendants.

3

Plaintiff asserts that on the date in question the four named defendants rushed into his cell and began punching him in the face, head, and body, and applied mace.  Complaint (Dkt. No. 1) § 6.  Plaintiff further contends that he was grabbed and placed in a choke hold by defendant Decker and flung to the concrete floor of his cell where defendant Cunningham "began to kick & stomp on [his] back and neck repeatedly." *Id.*  Plaintiff alleges that once subdued he was handcuffed by defendant Legg, and that the handcuffs were applied in such a fashion as to cause his hands to swell and turn blue and purple and that, when asked, defendants Brodhead and Decker refused to loosen the cuffs.  *Id.*  Plaintiff asserts that defendant Legg then dragged him by the handcuffs while the officers continued to beat him, and that he was pushed into the shower where he was scalded with hot water, and more mace was applied to his face and eyes.  *Id.*  Plaintiff alleges that as a result of the incident he was left in a great deal of pain and was unable to move, and that he was ultimately required to seek medical attention for injuries to his hands, wrists, neck and back, suffering permanent nerve damage in both his left and right hands.  *Id.*

The defendants' submissions to the court in support of their motion

portray a vastly different version of the relevant events.  According to the defendants, on the morning of July 27, 2008, defendant Cunningham, who at the time was acting as a pod officer for the Ulster County Sheriff's Department, received a call from his supervisor advising the plaintiff was to be transported to H-Pod where he was to serve a disciplinary period of confinement.  Cunningham Aff. (Dkt.  No. 38-1 Exh. C) ¶ 3.  At approximately 9:25 a.m. on that day, defendants Legg and Brodhead had arrived at C-Pod for the purpose of transporting the plaintiff and requested that defendant Cunningham open plaintiff's cell door, which he did from his remote location at the entrance to the pod.[2]  When defendants Legg and Brodhead entered plaintiff's cell and explained the purpose of their visit Mattison threw a cup of coffee toward the officers and dispersed the remainder of his belongings from his desk onto the floor.  Brodhead Aff. (Dkt. No. 38-1, Exh. E) ¶ 4; Legg Aff. (Dkt. No. 38-1, Exh. F) ¶ 4.  The plaintiff was verbally instructed to submit to the officers and permit himself to be handcuffed, but refused.  *Id.*  The officers then requested assistance

---

[2]      Defendant Cunningham's affidavit states that the incident occurred at approximately 9:25 p.m.  *See* Cunningham Aff. (Dkt. No. 38-1 Exh. C) ¶ 4.  It appears clear, however, from the remaining affidavits as well as excerpts of log book entries also before the court that the incident occurred in the morning, rather than the evening, of July 27, 2008.  *See, e.g.,* Decker Aff. (Dkt. No. 38-1 Exh. D) ¶ 4; Brodhead Aff. (Dkt. No. 38-1 Exh. E) ¶ 4; *see also* Defendants' Exhibits (Dkt. No. 38-1) Exhs. G and H.

from Corrections Corporal Decker.  *Id.*

After Corporal Decker's arrival plaintiff continued to resist and, according to the defendants' version, attempted to bite both defendant Legg and defendant Decker.  Brodhead Aff. (Dkt. No. 38-1, Exh. E) ¶ 5; Legg Aff. (Dkt. No. 38-1, Exh. F) ¶ 5; Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 5.  After a warning was given, chemical spray was administered by defendant Legg in order to end the confrontation.  Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 5; Legg Aff. (Dkt. No. 38-1, Exh. F) ¶ 5.  Plaintiff was subsequently subdued and transported to H-Pod, where he arrived in his cell at 9:40 a.m.  Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 6.  Plaintiff was escorted to H-Pod by two corrections officers, Blum and Bogart, who are not named as defendants in the action; none of the four named defendants participated in the escort.  Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 5.  Legg Aff. (Dkt. No. 38-1, Exh. F) ¶¶ 6-7.  The defendants categorically deny having choked, punched, or kicked the plaintiff and assert that it was his actions in refusing to submit and allow officers to handcuff him that resulted in the use of force and the deployment of chemical spray.  Cunningham Aff. (Dkt. No. 38-1 Exh. C) ¶ 7; Decker Aff. (Dkt. No. 38-1, Exh. D) ¶ 7; Brodhead Aff. (Dkt. No. 38-1, Exh. E) ¶¶ 6-7; Legg Aff. (Dkt.

6

No. 38-1, Exh. F) ¶ 7.

II.      PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint,
accompanied by a request for leave to proceed *in forma pauperis* ("IFP"),
on April 30, 2010.   Dkt. Nos. 1, 2.  Named as defendants in plaintiff's
complaint are Corrections Corporal Joseph Decker as well as Corrections
Officers Tyrone Brodhead, John Legg, and E.P. Cunningham.  Plaintiff
asserts an Eighth Amendment excessive force claim against each of the
four defendants and requests an award of compensatory damages in the
amount of $200,000.  *Id.*  Following a routine review of plaintiff's complaint,
I issued an order dated May 18, 2010 granting plaintiff's IFP application
and directing that the complaint be filed and summonses issued for service
by the United States Marshals Service.  Dkt. No. 5.

On April 29, 2011, after the joinder of issue and completion of
discovery, defendants moved for the entry of summary judgment
dismissing plaintiff's claims against them.  Dkt. No. 38.  The filing of that
motion was followed by submission of defendants' memorandum of law on
May 9, 2011.  Dkt. No. 40.  The court received plaintiff's response to
defendants' motion on June 20, 2011.  Dkt. No. 42.  Defendants' motion,

which is now fully briefed and ripe for determination, has been referred to

me for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See* Fed. Rule Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

       Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of

Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect the

outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248,

106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most

9

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is

warranted only in the event of a finding that no reasonable trier of fact

could rule in favor of the non-moving party.  *See Building Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

     B.   <u>Excessive Force/Failure to Intervene</u>

In their motion, defendants argue that no reasonable factfinder could

conclude plaintiff's Eighth Amendment rights were violated by their

conduct.[3]  As a basis for this contention defendants assert that the record

lacks evidence demonstrating defendants acted with subjective

---

     [3]    It is unclear from the record whether, at the relevant times, plaintiff was a sentenced prisoner or instead a pretrial detainee.  In the event that he was a pretrial detainee, his claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which applies to claims brought by inmates serving prison sentences.  *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2000).  In light of pronouncements by the Second Circuit reflecting that similar standards apply to excessive force claims brought under the Eighth and Fourteenth Amendments, resolution of this question is not outcome determinative, and I will therefore analyze plaintiff's claims under the Eighth Amendment.  *See Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009); *Corye v. Carr*, No. 9:08-CV-46, 2010 WL 396363, at * 8 n.9 (N.D.N.Y. Jan. 26, 2010) (Kahn, J. and DiBianco, M.J.).  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

wantonness.  Defendants also maintain that plaintiff's failure to identify any "lasting injury" provides further grounds for dismissal of her claim.

Plaintiff's contention that the four jail employees named in his complaint utilized excessive force against him implicates the Eighth Amendment's prohibition against cruel and unusual punishment.  *Whitley*, 475 U.S. at 319-320, 106 S. Ct. 1084-85; *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).  That amendment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

The lynchpin inquiry in deciding claims of excessive force against prison officials under the Eighth Amendment is "whether force was applied

in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective examination of the effect of the use of force and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. __ U.S. __,  130 S. Ct. 1175, 1178 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *See*

*Velasquez v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy,

C.J.) (quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see also*

*Romaine v. Rewson,* 140 F. Supp.2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).

Even a *de minimis* use of physical force can constitute cruel and unusual

punishment if it is "repugnant to the conscience of mankind."  *Hudson*, 503

U.S. at 9-10, 112 S. Ct. 1000 (citations omitted).

    With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000)

(internal quotations omitted)).  When addressing this component of an

excessive force claim under the Eighth Amendment calculus, the court can

consider the extent of the injury suffered by the inmate plaintiff.  While the

absence of significant injury is certainly relevant, it is not dispositive.

*Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury

13

is but one of the factors to be considered in determining whether a prison

official's use of force was "unnecessary and wanton"; courts should also

consider the need for force, whether the force was proportionate to the

need, the threat reasonably perceived by the officials, and what, if

anything, the officials did to limit their use of force.  *Whitley*, 475 U.S. at

321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when

prison officials use force to cause harm maliciously and sadistically,

'contemporary standards of decency are always violated . . . .  This is true

whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69

(quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard

gives rise to a federal cause of action."  *Griffen*, 193 F.3d at 91 (citing

*Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*,

481 F.2d at 1033 ("Not every push or shove, even if it later may seem

unnecessary in the peace of a judge's chambers, violates a prisoner's

constitutional rights").  Where a prisoner's allegations and evidentiary

proffers, if credited, could reasonably allow a rational factfinder to conclude

that corrections officers used force maliciously and sadistically, however,

summary judgment dismissing an excessive use of force claim is

14

inappropriate.  *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

The allegations set forth in plaintiff's complaint, if credited, would plainly satisfy both the objective and subjective prongs of the controlling Eighth Amendment test.[4]  Plaintiff alleges that defendants Decker, Brodhead, Legg, and Cunningham entered his cell, sprayed mace in his eyes and mouth, placed him in a choke hold and threw him to the concrete floor, where defendant Cunningham kicked him and stomped on his back and neck repeatedly.  Once handcuffed, plaintiff maintains that he was dragged by the handcuffs to the elevator where defendant Legg continued

---

[4]        While plaintiff has not submitted an affidavit to support his claims and oppose defendants' motion, the contents of his complaint are sworn to under the penalty of perjury and thus constitute the equivalent of an affidavit for purposes of defendants' summary judgment motion.  *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 & n.15 (7th Cir. 1985) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit)), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513 (1986).

to beat him, and that defendants Decker, Brodhead, and Cunningham

stood by during the ongoing assault by defendant Legg.[5]  Plaintiff further

asserts that he was then taken to the shower, where he was scalded with

hot water and again sprayed with mace.  These allegations, if credited,

could suffice to establish a claim of unlawful use of excessive force in

violation of the Eighth Amendment.  *See Velez v. McDonald*, No.

3:10cv483   2011 WL 1215442, at * 3-4 (D.Conn. Mar. 27, 2011); *Edwards

v. City of New York*, 08-cv-2199, 2010 WL 3257667, at * 4 (E.D.N.Y. Aug.

16, 2010).[6]

---

[5]    It should be noted that while defendants Decker, Brodhead, and Cunningham may not have actively participated in this portion of the alleged assault, this does not necessarily exonerate those officers from liability.  A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).  In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *See Curley*, 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007).

[6]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

16

From the conflicting accounts given by the parties this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine*, *Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia*, *Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). In moving for summary judgment despite this limitation it may be that defendants are attempting to invoke the limited exception created by the court in *Jeffreys v. City of New York*, 426 F.3d at 549. In that action, the Second Circuit recognized a very narrow exception to the otherwise steadfast rule against resolving issues of credibility on a motion for summary judgment. *Slacks v. Gray*, No. 9:07-CV-510, 2009 WL 3164782, at *13 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.). The *Jeffreys* court held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and where even after drawing all inferences in a light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the plaintiff's testimony. *Jeffrey*s, 426 F.3d at 54-55. In so holding, the court cited with approval the district court's opinion in *Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998), which granted summary judgment in an excessive

force case based upon the absence of any evidence in the record to corroborate the plaintiff's version of the events, highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." *Slacks*, 2009 WL 3164782, at *13 (citing *Jeffreys*, 426 F.3d at 555 and quoting *Shabazz*, 994 F. Supp. at 470).[7]

In this district, it appears that in order to qualify for application of the *Jeffreys* exception a defendant must meet the following three requirements: 1) the plaintiff must rely "almost exclusively on his own testimony"; 2) the plaintiff's testimony must be "contradictory or incomplete"; and 3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, C.J. and Lowe, M.J.) (citing and quoting *Jeffreys*).

---

[7]        The court in *Shabazz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Shabazz*, 994 F. Supp. at 470. While approving of the lower court's reasoning in *Shabazz*, the *Jeffreys* court was careful to distinguish *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir.1997), another case it had previously decided, wherein it reversed the grant of summary judgment in an excessive force case. *Jeffreys*, 426 F.3d at 554-55.  In doing so, the court emphasized that in *Fischl* the plaintiff's testimony that he was beaten was supported by 1) photographs showing severe bruises, 2) hospital records showing that he had fractures of the head; 3) a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and 4) the fact that the plaintiff's eye socket fracture could not have been self-inflicted.  *Id.*

To be sure, as defendants assert, plaintiff's excessive force claims are uniformly contradicted by the flat denials of each of the defendants and lack support from the log entries submitted in support of defendants' motion.  Defendants' accounts of the relevant events are also supported by the fact that there is no indication that at or shortly after the time of the incident plaintiff required medical treatment.  Nonetheless, this case does not need meet the *Jeffreys* exception for two reasons.  First, defendants are unable to cite to any contradictory or incomplete accounts of the relevant events given by the plaintiff.  Secondly, while plaintiff's claim principally relies upon his account of the relevant events, there is at least some modest corroborative support for his version, given that the medical evidence now in the record suggests that he sought and obtained medical treatment for a hand injury beginning in October of 2008, three months after the alleged assault.  *See* Plaintiff's Exhibits (Dkt. No. 42).  While there is nothing in plaintiff's medical records directly linking his injuries to the alleged assault, and in fact one entry reflects the finding of edema to plaintiff's left hand of "unknown cause", nonetheless drawing all inferences in plaintiff's favor, a reasonable factfinder could conclude that the injury stems from the fact that plaintiff was tightly handcuffed and that defendants

dragged him by those handcuffs during the July 2008 incident, as alleged in plaintiff's complaint.  *See Scott*, 344 F.3d at 282; *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) ("If the jury were to credit [plaintiff's] version of the facts and believe his allegations of handcuff tightening, infliction of pain, verbal abuse, humiliation and unnecessary confinement to a restraint bag in a painful position, our prior cases indicate that the use of force under [defendant's] supervision might well be objectively unreasonable and therefore excessive.").  For these reasons, I recommend that the court not invoke the narrow *Jeffreys* exception to the otherwise staunch rule that issues of credibility must be resolved at trial, rather than on a motion for summary judgment, and that it deny defendants' motion.

      C.   <u>Qualified Immunity</u>

In addition to their contention that the court should grant them summary judgment on the merits, defendants additionally contend that they are entitled to qualified immunity from suit.  Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738

(1982) (citations omitted).  "In assessing an officer's eligibility for the

shield, 'the appropriate question is the objective inquiry whether a

reasonable officer could have believed that [his or her actions were] lawful,

in light of clearly established law and the information the officer[ ]

possessed."  *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir.

2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692

(1999)).  The law of qualified immunity seeks to strike a balance between

the need to hold government officials accountable for irresponsible conduct

and the need to protect them from "harassment, distraction, and liability

when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S.

223, 129 S. Ct. 808, 815 (2009) .

    In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the

Supreme Court "mandated a two-step sequence for resolving government

official's qualified immunity claims."  *Pearson*, 555 U.S. at 232, 129 S. Ct.

at 815-16.  The first step requires the court to consider whether, taken in

the light most favorable to the party asserting immunity, the facts alleged

show that the conduct at issue violated a constitutional right,[8] *Kelsey*, 567

---

[8]    In making the threshold inquiry, "[i]f no constitutional right would have
been violated were the allegations established, there is no necessity for further inquiries
concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

F.3d at 61, with "the second step being whether the right is clearly

established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d

415, 430 n.9 (citing *Saucier*).[9]  Expressly recognizing that the purpose of

the qualified immunity doctrine is to ensure that insubstantial claims are

resolved prior to discovery, the Supreme Court recently retreated from the

prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he

judges of the district courts and courts of appeals are in the best position to

determine the order of decisionmaking [that] will best facilitate the fair and

efficient disposition of each case", those decision makers "should be

permitted to exercise their sound discretion in deciding which of the . . .

prongs of the qualified immunity analysis should be addressed first in light

of the circumstances of the particular case at hand."[10]  *Pearson*, 555 U.S.

at 236, 242, 129 S. Ct. at 818, 821.  In other words, as recently

----

[9]      In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

[10]      Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991) (per curiam)).

emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

In this instance, the right of prison inmate to be free from the use of excessive force was clearly established in July of 2008.  *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007), *cert. denied*, 552 U.S. 818, 128 S. Ct. 109 (2007).  Defendants would be hard pressed to show that prison officials in defendants' position could have reasonably believed that the use of excessive force, as alleged in plaintiff's complaint, would not run afoul of the Eighth Amendment's prohibitions.  Accordingly, I recommend

against a finding that the defendants are entitled to qualified immunity from

suit.  *See Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003)

(reversing grant of summary judgment on qualified immunity grounds

finding credibility questions as to whether force was used as well as the

surrounding circumstances).

IV.    SUMMARY AND RECOMMENDATION

       Although there is much room for healthy skepticism regarding

plaintiff's version of the events surrounding his removal from his C-Pod cell

in order to transfer him, for disciplinary reasons, to another area of the jail

facility at Ulster, the record now before the court presents directly

contradictory versions of the relevant events, with plaintiff alleging facts

which, if true, would plainly support a finding that his Eighth Amendment

rights were violated, and defendants flatly denying any use of force beyond

that necessary to subdue a non-compliant inmate and arrange for his

transfer.  Such a conflict presents credibility issues that are not

appropriately resolved on a motion for summary judgment.  Accordingly, it

is hereby respectfully

       RECOMMENDED that defendants' motion for summary judgment

dismissing plaintiff's complaint (Dkt. No. 38) be DENIED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

Dated:      January 11, 2012
                Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

25



Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Julian John CORYE, Plaintiff,
v.
Kevin CARR, Edgar Remillard, Peter Kusaywa, Bradley Chase, Defendants.
No. 9:08-CV-46 (LEK/GJD).

Jan. 26, 2010.

Julian John Corye, pro se.

Stephen J. Rehfuss, Esq. for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on September 30, 2009 by the Honorable Gustave J. DiBianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 69). After ten days [FN1] from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Defendants, Sergeant Peter Kusaywa and Officers Bradley Chase, Kevin Carr, and Edgar Remillard, which were filed on October 15, 2009 (Defendant Objections (Dkt. No. 70)) and Plaintiff, Julian John Corye, which were filed on October 19, 2009 (Plaintiff Objections (Dkt. No. 72)).

> FN1. Plaintiff filed his objections October 19, 2009. The court will accept Plaintiff's objections as timely as the court has the duty to show liberality toward pro se litigants. *See Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein. Regarding Defendants' objection to the denial of summary judgment for Plaintiffs' failure to exhaust remedies, this Court notes that the additional evidence supplied by Defendants to support their motion fails to show that there is no genuine issue as to any material fact on the issue of whether Plaintiff should be excused for his failure to comply with administrative remedies.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 69) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' motion for summary judgment (Dkt. No. 57) is **GRANTED** and the amended complaint **DISMISSED AS TO ALL DEFENDANTS only as to the claims of failure to protect and denial of medical care;** and it is further

**ORDERED,** that the Defendants' motion for summary judgment (Dkt. No. 57) is **DENIED** as to the issue of failure to exhaust; and it is further

**ORDERED,** that the Defendants' motion for summary judgment (Dkt. No. 57) is **DENIED with respect to the issue of excessive force;** and it is further

ORDERED, that Plaintiff's **cross-motion for summary judgment** (DKT. No. 59) is **DENIED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

on all parties.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that on March 1, 2007, defendants failed to protect him from an attack by other inmates at the Albany County Correctional Facility and engaged in excessive force against plaintiff during and after the attack by the other inmates. (Amended Complaint (AC)) at 4-5) (Dkt.No.25). Plaintiff also alleges that after the incident, he was placed in a cell prior to receiving any medical attention. (AC at 5-6).

**\*2** Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 57). Plaintiff opposes the motion, has filed a response in opposition to the motion, and has cross-moved "in the alternative" for summary judgment. (Dkt. No. 59). For the following reasons, this court will recommend granting the defendants' motion in part and denying it in part. To the extent that plaintiff's papers can be interpreted as a cross-motion for summary judgment, the court will recommend denying the motion.

**DISCUSSION**

**1.** *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the " 'the pleadings, depositions, answers to interrogatories, and admissions on the file, together with any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

**2.** *Facts*

Plaintiff is currently incarcerated at Cayuga Correctional Facility, but was incarcerated at Albany County Correctional Facility (ACCF) in early 2007. (*See* AC). At his deposition, plaintiff stated that he had been assigned to the Three West tier at ACCF for at least one month. Rehfuss Aff. Ex. E (Deposition ("Depo .")) at 8) (Dkt. No. 57). Plaintiff was then assigned to keeplock [FN1] after an altercation on the Three West tier, and stated that he had been on his new tier for only one day prior to March 1, 2007. (Depo. at 6, 8).

    FN1. Keeplock is disciplinary confinement in which an inmate is confined to his own cell.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

*Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir.1989).

**\*3** Plaintiff states that on the morning of March 1, 2007, his asthma was bothering him, and he asked Defendant Remillard for permission to go to the medical unit. (AC at 4). Plaintiff also claims that on the morning of March 1, 2007, an unnamed inmate warned plaintiff that he was going to be attacked by other inmates. *Id.* At his deposition, plaintiff stated that he knew he would have problems on the new tier because "the tier was predominantly the down-towners, like the uptown/downtown thing, and being that I live uptown I'm considered a uptown resident." (Depo. at 7).

Based on the alleged warning from the other inmate, plaintiff packed his belongings, and when defendant Remillard let plaintiff out of his cell to go to the medical unit, plaintiff took all his belongings with him to the front gate. (AC at 4). Plaintiff reported to the "bullpen," which contains the two front gates that lead to the officers' desk. (AC at 4; Depo. at 7). Defendant Remillard asked plaintiff what he was doing, and plaintiff stated that he still wanted to go to the medical unit, but that he also could not continue to live on that tier. (AC at 4; Depo. at 7).

In his response to the motion for summary judgment, plaintiff states that when an inmate says "he can't live here," the statement is code for "if you leave me on this tier something bad will happen." Pl. Statement of Material Fact at ¶ 18 (Dkt. No. 59). Plaintiff states that defendant Remillard then locked plaintiff in between the two gates near the officers' desk. (AC at 4; Depo. at 7).

Plaintiff states that while he was locked between the gates, some inmates started talking to plaintiff and spitting on him. (AC at 4; Depo. at 10). In the amended complaint, plaintiff states that defendant Remillard saw this occurring and instructed plaintiff to go back to his cell. *Id.* At his deposition, plaintiff testified that defendant Remillard left "for a second," and other inmates approached plaintiff while yelling at him. (Depo. at 10). Plaintiff testified that one of the inmates spat on plaintiff. *Id.*

Plaintiff testified that defendant Remillard came back, and asked plaintiff if he would go back to his cell. *Id.*

Plaintiff then requested to see the sergeant. (AC at 4; Depo. at 10). Plaintiff states that defendant Remillard opened the gate leading back to the tier, and told the inmates "ya'll can get him now" [sic]. *Id.* Plaintiff states that at this point, approximately fifteen inmates "jumped" him. (AC at 4; Depo. at 11).

At his deposition, plaintiff testified that the inmate attack lasted for about five minutes, but that he was "not really" injured during the fight. (Depo. at 11). Plaintiff testified that defendants Kusaywa, Remillard, Carr and Chase were involved in breaking up the fight.[FN2] (Depo. at 12-13). Plaintiff states that when the altercation was over, defendant Kusaywa handcuffed plaintiff, brought him to the officers' desk, and told him not to move. (AC at 5; Depo. at 11). Plaintiff states that he heard either defendant Remillard or Carr tell defendant Kusaywa that plaintiff was "moving." (AC at 5; Depo. at 14-15).

> FN2. Plaintiff stated that he obtained these names during the course of this litigation. (Depo. at 13).

**\*4** At this point, plaintiff alleges that the guards attacked plaintiff. (AC at 5; Depo. at 14-15). Plaintiff claims that defendant Kusaywa pulled on plaintiff's collar, causing him to fall backward and hit his head on the ground. (AC at 5). Plaintiff claims that at least three or more officers participated in "stomping on" and kicking plaintiff in the face, neck, back, chest, and testicle.[FN3] (AC at 5; Depo. at 15). At his deposition, plaintiff claimed that he saw the defendants' faces. (Depo. at 15).

> FN3. Plaintiff had only one testicle. Plaintiff testified that he lost the other testicle because of delayed medical care for a urinary tract infection. (Depo. at 16).

Plaintiff testified that he did not know how long the attack lasted, and that he lost consciousness once during the attack. (Depo. at 16). Plaintiff states that the guards, including one who did not participate in the attack, picked him up, and that defendant Carr grabbed plaintiff by the testicle. (AC at 5; Depo. at 16-17). Plaintiff testified that he was eventually escorted to a cell in another part of the facility. (Depo. at 17-18). Plaintiff states that he did not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

receive any medical care at that time. (AC at 5).

Plaintiff testified when he was brought to the cell, the handcuffs were removed. (Depo. at 18). Plaintiff testified that he lost consciousness in the cell, and vomited. *Id.* In his amended complaint, plaintiff states that at some point, he tried to stand up and fainted again. (AC at 5). Plaintiff testified that when he woke up, there was blood on him and "all over" the cell floor, and three nurses were present in the cell. (Depo. at 19). Plaintiff stated that he was transported to the medical unit, and that emergency medical services were called to the facility. (Depo. at 19-20). Plaintiff was taken to Albany Medical Center for treatment of his injuries. (AC at 6; Depo. at 21).

Plaintiff testified that he returned to ACCF later that night. (Depo. at 22). Plaintiff was assigned to the Medical Unit, and stayed there for approximately seven days before he was returned to the general population. (Depo. at 23). Plaintiff testified that his injuries on March 1, 2007 included a swollen wrist, a laceration on his forehead, and a slight concussion. (Depo. at 19, 21, 23-24). Plaintiff stated that he had dizzy spells, but that they eventually went away. (Depo. at 24). At the time of his deposition, plaintiff stated that he continued to have severe headaches and testicle pain. *Id.* Plaintiff testified that he was still waiting to see a specialist for the headaches, but that a doctor has told plaintiff that there is nothing else to do to treat the testicle pain. (Depo. at 25, 39).

### 3. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a) requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004).

**\*5** Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* 2005 U.S. Dist. LEXIS 6070, \*12-15 (W.D.N .Y. Feb. 18,

2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at \*12-13 (citing *Giano,* 380 F .3d at 675).

In *Jones v. Bock,* 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103. In *Woodford,* the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The Inmate Grievance Program for county jails is outlined in Title 9 of the New York Code of Rules and Regulations, in Subtitle AA, governing the Commission of Correction. N.Y. COMP.CODES R. & REGS. (N.Y.CRR), tit. 9, §§ 7032.1 *et seq.* Section 7032.1 provides that the chief administrative officer of a local facility must establish and maintain a formal inmate grievance program, however, "[e]very effort shall be made to resolve inmate complaints in an informal manner." *Id.*

The regulations provide that the chief administrative officer of the local correctional facility shall designate a staff member to act as grievance coordinator. 9 NYCRR § 7032.4(e). Facility staff must make grievance forms available to inmates who wish to file grievances. *Id.* § 7032.4(d). An inmate must file his grievance within five days of the act or occurrence giving rise to the grievance. *Id.* The regulations contain minimum requirements for the investigation of an inmate grievance. *Id.* § 7032.4(f)-(g).

The grievance coordinator must issue a written determination within five days of receipt of the grievance. *Id.* § 7032.4(i). The inmate has two days within which to appeal an adverse determination to the chief

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

administrative officer or his designee, who has five days to issue a decision on the appeal. *Id.* §§ 7032.4(j)-(k). If the inmate is dissatisfied with the chief administrator's decision, the inmate has three days to appeal to the State Commission of Correction by indicating his or her desire to appeal on the inmate grievance form in the space provided. *Id.* § 7032.5(a). The grievance coordinator of the local facility has three days after receiving the inmate's notice of appeal to send the appeal, the accompanying investigation report, and all the other pertinent documents to the Commission's Citizen's Policy and Complaint Review Council. *Id.* § 7032.5(b). Section 7032.5 contains very detailed requirements for the timing of the appeal determination and the implementation of any favorable determination. *Id.* § 7032.5(d)-(e).

**\*6** The Second Circuit has developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir .2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Although after *Woodford,* there was some question whether exhaustion could be "excused," the Second Circuit has continued to apply the three factors articulated in *Brownell,* and has found error when the district court failed to conduct this analysis. *See Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Harrison v. Goord,* No. 07 Civ. 1806, 2009 U.S. Dist. LEXIS 48478, \*20-21 n. 6 (S.D.N.Y. June 9, 2009) (citing *Vogelfang v. Riverhead County Jail Officers,* No. 07-1268, 2009 U.S.App. LEXIS 1914 (2d Cir. Feb. 2, 2009) (finding error in district court's failure to consider plaintiff's arguments that exhaustion should be excused); *Toomer v.. County of Nassau,* No. 07-CV-1495, 2009 U.S. Dist. LEXIS 38160 at \*25 n. 8 (E.D.N.Y. May 5, 2009) (collecting cases)).

In this case, defendants argue that plaintiff has failed to exhaust his administrative remedies because he did not file a grievance complaining of this incident. Defendants

cite *Brownell* and argue that plaintiff should not be excused from the exhaustion requirement. Def. Reply Mem. at 10. Defendants argue that the grievance procedure was "available to plaintiff." *Id.* Plaintiff admitted that he had filed grievances in the past and should have known the proper recipient of the grievance. Defendants also argue that instead of appealing to the Central Office Review Committee, he appealed to Sheriff Campbell. Finally, defendants argue that the New York regulations provide that plaintiff could have filed his grievance after he was transferred to Downstate Correctional Facility. Def. Reply Mem. at 10.

In the amended complaint, plaintiff states that "[d]ue to mitigating circumstances, [he] was unable to file a timely grievance ." (AC at 6). During his deposition, plaintiff testified that the officers in his housing unit "would not take" the grievance. (Depo. at 31). Plaintiff states that he could not even obtain a grievance form, so he wrote the grievance on a plain piece of paper. (Depo. at 31). Plaintiff claims that he gave his grievance to a female sergeant at ACCF when he was "moved ... to the other side," but he never got a response. *Id.* (Depo. at 32). Plaintiff has submitted a copy of the "grievance" that he says he gave to the sergeant. Pl. Mem. of Law, Ex. A (Dkt. No. 59-2). Plaintiff claims that he was "constantly being threatened not to put in grievances." (Depo. at 31).

**\*7** Plaintiff also testified that he was familiar with the grievance process, and that he filed "many grievances." (Depo. at 32). He stated, however, that some of his grievances appear to have been resolved "informally." [FN4] (Depo. at 33). Plaintiff stated that after he was transferred to Downstate, he attempted to write to Albany County Sheriff James Campbell, but received no response. *Id.* at 33. Plaintiff claims that he sent Sheriff Campbell a copy of the grievance together with a letter of explanation. (Depo. at 35).

> FN4. As an example of an "informal" resolution, plaintiff testified about a grievance regarding a pair of sneakers. (Depo. at 33). He stated that he filed a grievance, but then the issue was resolved by speaking with the Sergeant. *Id.*

The court must first note that defendants appear to

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

cite the incorrect sections of the NYCRR. Defendants begin their argument citing to the appropriate section of Title 9 of the NYCRR, and then make their argument based upon the sections that apply to New York **State** inmates. Def. Mem. of Law at 8 (Dkt. No. 57-4). Defendants argue that plaintiff should have filed a grievance with the "grievance clerk," with an intermediate appeal to the Superintendent, and a final appeal to the Central Office Review Committee (CORC).[FN5] *See* 7 NYCRR § 701.5. However, these sections apply to New York State facilities and not to local facilities. *Compare* 7 NYCRR § 701.5 *with* 9 NYCRR §§ 7032.1 *et seq.* The ultimate appeal for a county jail inmate appears to be the Commission of Correction, **not** the CORC.

> FN5. Defendant cite the incorrect section of the NYCRR for state facilities as well. The sections relating to grievance procedures were re-numbered in **2006**, and thus, although defendants cite 7 NYCRR § 701.7 as the section generally governing the grievance procedure, that section was renumbered and is now section 701.5. *See Espinal v. Goord,* 554 F.3d 216, 224 (2d Cir.2009) (discussing the 2006 amendments). The differences in the regulations are minor, but the section numbers have changed. *Id.*

Defendants also cite 7 NYCRR § 1700.5(a), (b) for the proposition that plaintiff could have properly filed his grievance after he was transferred to Downstate. Unfortunately, this section refers to inmate **personal property** claims and states that the facility in which the loss occurred must cooperate with the processing facility to provide investigative assistance as requested.[FN6] 7 NYCRR § 1700.5(b). This section has no application to a grievance regarding a claim of excessive force and does not discuss inmates who transfer from county to state facilities. Thus, defendants' citation of this section does not support their argument that plaintiff could have filed a grievance **after** he was sent to Downstate.

> FN6. The Second Circuit cited these two sections of the NYCRR in *Brownell,* however, the inmate in *Brownell* was transferred from one **state** facility to another, and the issue was, in fact, a claim of **lost property.** 446 F.3d at 312.

While generally, transfer does not excuse the exhaustion requirement, the issue is more complicated when an inmate is transferred to the custody of a different "government." *See Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2004); *Key v. Toussaint,* No. 05 Civ. 10461, 2009 U.S. Dist. LEXIS 82488, *14-17 (S.D.N.Y. Sept. 19, 2009) (discussing transfer from state to federal custody). The question then becomes whether the inmate would have had time to pursue his administrative remedies while still confined to the county facility. *Berry,* 366 F.3d at 88. In *Berry,* the court found that the plaintiff would have had time to utilize the grievance mechanism prior to his transfer, however, the Second Circuit specifically stated that it was not considering 7F'situations where only a brief interval elapses between the episode giving rise to the prisoner's complaint and the prisoner's transfer to the custody of another jurisdiction." 366 F.3d at 88 n. 3.

**\*8** Plaintiff submits the "grievance" that he filed. Plaintiff testified that he filed previous grievances by writing the grievance out and giving it to the "officer," who then wrote down what the plaintiff wanted on the grievance form. (Depo. at 32). Plaintiff also testified that "nine times out of ten the grievance never gets to the grievance officer in charge." *Id.* Plaintiff then stated that he also filed grievances by writing the grievance and putting it in the mailbox to the Superintendent, "and it gets to where it's supposed to." *Id.*

Although the grievance mechanism was clearly "available" in a technical sense, if plaintiff believed that he had given his grievance to an officer, and plaintiff was waiting for an answer, it is unclear when he would have realized that an answer was not forthcoming. It appears that plaintiff was transferred to Downstate after March 26, 2007, but before April 29, 2007.[FN7] It is therefore, unclear whether plaintiff would have had time to follow-up on the grievance and whether any alleged actions or threats by corrections personnel prevented plaintiff from filing or appealing his grievance. Exhaustion is an affirmative defense that defendants bear the burden of raising **and** proving. *Jones v. Bock,* 549 U.S. at 211-17. This court finds that based upon the evidence presented, there is at least a question of fact as to whether plaintiff should be excused from the exhaustion requirement [FN8] The court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

will not recommend dismissal for failure to exhaust at this time and will proceed to consider defendants' other bases for requesting dismissal.

> **FN7.** Plaintiff testified that he was at ACCF for approximately a month and one week or a month and one half after the incident. (Depo. at 23). Plaintiff's exhibits show that plaintiff was still in ACCF on March 26, 2007 because he asked for medical treatment on that day. Pl.Ex. E at 5 (ACCF Health Services Request form dated 3/26/07). However, by April 29, 2007, he was at Downstate. Pl.Ex. B (Plaintiff's Letter to Sheriff Campbell, written from Downstate and dated 4/29/07).

> **FN8.** The court does ***not*** find that plaintiff has exhausted his administrative remedies or even that plaintiff should be excused from the exhaustion requirement. Rather, the court finds that there remains a question of fact based on the lack of evidence presented by defendants. The court will recommend denial of the motion on this basis ***without prejudice*** should defendants submit affidavits, evidence, and additional argument.

**4.** *Failure to Protect*

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.' " [FN9] *Hendricks v. Coughlin,* 942 F.2d 109, 112 (2d Cir.1991) (citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id.* at 113. In order to state an Eighth Amendment or Fourteenth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a

substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

> **FN9.** It is unclear in this case whether plaintiff was a pretrial detainee or a sentenced inmate at the time of the incident in question. Defendants do not make this distinction, and have used the Eighth Amendment as a reference. The Eighth Amendment applies only to sentenced inmates, while the ***Fourteenth Amendment*** protects pretrial detainees. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). The Second Circuit has recently held, however, that the standards for evaluating a claim of deliberate indifference is analyzed by the subjective standard used in Eighth Amendment cases. *Caiozzo v. Koreman,* No. 05-4002, 2009 U.S.App. LEXIS 20928 (2d Cir. Sept. 22, 2009) (medical care context). The Eight Amendment standard is also used in case of excessive force. *Jacoby v. County of Oneida N.Y.,* 9:05-CV-1254, 2009 U.S. Dist. LEXIS 83235, *13 (N.D.N.Y. Sept. 11, 2009) (citations omitted). Thus, the Eighth Amendment deliberate indifference standard applies regardless of whether plaintiff was a pretrial detainee or a sentenced inmate at the time.

In this case, plaintiff alleges that defendant Remillard failed to protect plaintiff from an assault by other inmates. There is absolutely no evidence that defendant Remillard knew of or disregarded a serious risk to plaintiff. Plaintiff testified at his deposition that defendant Remillard "left for a second," while the plaintiff was allegedly arguing with other inmates. (Depo. at 10). Even though plaintiff testified that when defendant Remillard opened the gate, he stated "ya'll can get him now," plaintiff does not indicate how defendant Remillard would have been aware that plaintiff was in danger. Plaintiff also testified that he knew defendant Remillard before the incident, but he was just an "A-hole ." (Depo. at 43).

**\*9** Although plaintiff claims in his response to the motion for summary judgment that his statement to defendant Remillard that plaintiff could not live in the tier any more was some sort of code, there is absolutely no indication that defendant Remillard would have been aware of a danger to plaintiff from any particular imate or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

group of inmates. Thus, plaintiff's claim of failure to protect may be dismissed as against defendant Remillard.

### 5. *Excessive Force*

An Eighth or a Fourteenth Amendment claim that defendants used excessive force has a subjective and an objective component. *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2004). The subjective component focuses on the *motive* for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 7; *Whitely v. Albers,* 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973)).

The objective component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.i' " *Whitely,* 475 U.S. at 327. The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8) (internal quotation marks omitted). However, where the defendants' use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson,* 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.* at 269. The lack of a serious injury is "relevant," but does not end the analysis. *Hudson,* 503 U.S. at 7. The extent of the injury must be considered "in context." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003). The court must determine the need for the force, the relationship between the need and the

amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321.

In this case, defendants request summary judgment based on their argument that they were merely breaking up a fight and that any force used was to restore order and to prevent plaintiff from harming himself or others. Plaintiff acknowledges that he was engaged in an altercation, but testified that he was not really injured as a result of that altercation. (Depo. at 11). Rather, plaintiff claims that defendants used excessive force upon plaintiff *after* they broke up the altercation and after plaintiff was handcuffed.

**\*10** The court notes that defendants have not submitted *any* affidavits regarding the facts surrounding this incident. As stated above, the court must resolve all ambiguities in favor of the non-moving party. *United States v. Diebold, Inc., supra.* Plaintiff did require hospitalization after the incident, and although the extent of plaintiff's injuries is unclear, there is a genuine issue of material fact regarding the incident. Thus, the court will not recommend granting summary judgment on the excessive force claim.

### 6. *Medical Care*

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). As in the excessive force cases, the subjective and objective elements apply. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). *See Caiozzo v. Koreman,* No. 05-4002, 2009 U.S.App. LEXIS 22-23 (2d Cir. Sept. 22, 2009) (applying standard to pretrial detainees). The objective element measures the severity of the deprivation, while the subjective element ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). A medical condition has been considered

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)

(Cite as: 2010 WL 396363 (N.D.N.Y.))

"sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F .3d at 702). As in the failure to protect claims, defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

**\*11** In this case, plaintiff is not complaining about the medical care that he ultimately received. He appears to be claiming that defendants did not take him directly to the medical unit after the altercation. Plaintiff's own exhibits show that whatever delay the plaintiff experienced before obtaining medical care was minuscule. A report written by Officer John Crowley [FN10] states that at 8:05 a.m., plaintiff was put in cell C-North 143. Pl.Ex. F at 11. The report then states that "[a]t 8:20 AM Inmate Julian Corye was escorted to medical by Lt. Wojcik." *Id.* The delay in plaintiff's care was approximately twenty minutes. There is absolutely no evidence that the delay in treatment was serious. Defendants motion for summary judgment may be granted on this issue.

FN10. Officer Crowley is not a defendant in this

case and was not involved in any of the incidents alleged by plaintiff.

**WHEREFORE,** based on the findings above, it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 57) be **GRANTED** and the amended complaint **DISMISSED AS TO ALL DEFENDANTS only as to the claims of failure to protect and denial of medical care,** and it is

**RECOMMENDED,** that the defendants' motion for summary judgment (Dkt. No. 57) be **DENIED WITHOUT PREJUDICE** as to the issue of failure to exhaust, and it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 57). be **DENIED** with respect to the issue of excessive force, and it is further

**RECOMMENDED,** that plaintiff's "cross-motion" for summary judgment (Dkt. No. 59) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Corye v.Carr
Not Reported in F.Supp.2d, 2010 WL 396363 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at \*3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003) (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to him. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1215442 (D.Conn.)

(Cite as: 2011 WL 1215442 (D.Conn.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Alex VELEZ, Plaintiff,
v.
Jeff McDONALD, et al., Defendant.
Civil No. 3:10cv483 (JBA).

March 27, 2011.
Alex Velez, Bridgeport, CT, pro se.

James W. Caley, Office of the Attorney General, Hartford, CT, for Defendant.

**RULING ON MOTION TO DISMISS**

JANET BOND ARTERTON, District Judge.

**\*1** Plaintiff Alex Velez filed this action *pro se* against Connecticut Department of Corrections personnel Lieutenant Jeff McDonald and Officers Michael McGoughan, Joseph Busalacchi, Scott Langenheim, James Durkin, Kevin O'Meara, and Ryan Rogozinski under 42 U.S.C. § 1983 for use of excessive force in violation of his Fourth, Eighth, and Fourteenth Amendment rights; assault and battery; and intentional infliction of emotional distress ("IIED"). Defendants have moved [Doc. # 10] to dismiss Plaintiff's claims against Defendants in their official capacity pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Plaintiff's excessive force, supervisory liability, and intentional infliction of emotional distress claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons discussed below, Defendants' motion will be granted in part and denied in part.

**I. Factual Allegations**

During the period relevant to his Complaint, Velez was incarcerated at Garner Correctional Institution ("Garner") in Newtown, Connecticut. (Compl. [Doc. # 1]

¶ 2.) Velez alleges that on May 10, 2008 Defendants McCoughan and Busalacchi escorted him back to his cell at the Inpatient Medical Unit at Garner after a shower. (*Id.*) According, to Velez, McCoughan pushed him into his cell, grabbed Velez's handcuffs through the cell's trapdoor, closed the cell door, and proceeded to pull Velez's hands, wrists, and arms through the trapdoor. (*Id.* ¶ 3.) Velez slipped on the wet floor of his cell, which had been recently washed, as McCoughan and Busalacchi continued to pull his arms through the trapdoor and "ben[t] the handcuffs into [Velez's] wrists inflicting bodily harm to [him]." (*Id.* ¶¶ 4–5.) Velez alleges that McCoughan then released one of Velez's hands from the cuffs, and while Velez's face was "at the trap door" sprayed him in the face with mace two times at point blank range. (*Id.* ¶ 6.) McCoughan and Busalacchi continued to pull Velez's arm through the trapdoor, removed the other handcuff from Velez, and McCoughan "pushed his body alarm." (*Id.* ¶¶ 7–8.)

Defendants Durkin and McDonald came to Velez's cell window to find Velez "yelling and screaming [']my eyes, my eyes, please get me out of here['] and they [left]." (*Id.* ¶ 9.) Velez was "in intense pain" and stuck his hands "out of the trapdoor and start[ed] lifting it up and down banging it to try to get the Officers and Lieutenant to get [him] out of the cell." (*Id.* ¶ 10.) He claims that McDonald returned to the cell door, closed the trapdoor, and refused to remove Velez from the cell to decontaminate him, forcing Velez "to inhale all the chemical munitions fumes from the **mace** for at least another 10–15 minutes." (*Id.* ¶¶ 11–12.) After leaving Velez in his cell for this time period, McDonald instructed Velez to "get handcuffed" and Velez complied. (*Id.* ¶ 13.) Durkin and O'Meara escorted the handcuffed Velez to the shower, but after removing him from his cell they "used **excessive force** and malicious [ ] and wanton force to slam [Velez] into the wall while [he] was being cooperative at all times." (*Id.* ¶ 14.) Velez alleges that despite protocol requiring immediate decontamination and his "cries about the burning sensation to [his] eyes, ears, mouth, and nose," Durkin and O'Meara brought him to the day-room table instead of the shower. (*Id.* ¶ 15.) Rodozinski and McDonald accompanied Velez and the other officers, and according to Velez, McDonald,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2011 WL 1215442 (D.Conn.)

(Cite as: 2011 WL 1215442 (D.Conn.))

"who was the supervisor in charge and who at all times knew what was being done to [Velez]" refused to intervene. (*Id.* ¶ 16.) Velez also alleges that during this time, O'Meara and Durkin "were tightening the handcuffs on my wrists inflicting pain on me." (*Id.* ¶ 17 .)

**\*2** While at the day-room table, Velez continued to "cry and complain" to McDonald that his face was burning and that he was having chest pains, but McDonald "chose to do nothing." (*Id.* ¶ 18.) After the Officers "finally escorted" Velez to the shower for decontamination, Defendant Langenheim "open handed slapped" Velez in the face and Durkin, Langenheim, and O'Meara "slammed" him onto the shower floor. (*Id.* ¶¶ 19–22.) During this time, Velez was "crying and yelling at Defendant Langenheim and asking why he hit me, I did nothing wrong." (*Id.* ¶ 23.) The Officers then escorted Velez back to the day room table for medical help and again "threw" him on the floor "for no reason at all." (*Id.* ¶ 24.) Velez alleges with respect to both instances of being thrown to the floor that Lieutenant McDonald told the Officers "to place [Velez] on the ground." (*Id.* ¶ 25.)

Velez alleges that due to the incidents described above he suffered "minor nerve damage" to his wrists, a "busted blood vessel" in his right eye, "bruising and cuts" under his right eye, an "abrasion" on his forehead, "head and neck pains," and aggravation to a previous injury to his back. (*Id.* ¶ 26–30.) Velez also claims that during this altercation he "was compliant at all times." (*Id.* ¶ 30.)

## II. Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *accord Kuck v. Danaher,* 600 F.3d 159, 162–63 (2d Cir.2010). A complaint will not survive if it relies on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal,* 129 S.Ct. at 1949–50.

## III. Discussion

### A. Monetary Damages Against Defendants in Their

**Official Capacity**

Defendants argue that to the extent that Velez names them in their official capacity, any award of monetary damages is barred by the Eleventh Amendment. (Mem. Supp. [Doc. # 10–1] at 7–8.) In listing the Defendants in his Complaint, Velez writes "Official & Individual Capacity" after the name of each Defendant, however he describes each of his Claims for Relief as against Defendants "in their individual capacity." Velez clarifies in his Objection [Doc. # 13] to the Defendants' Motion to Dismiss that he seeks money damages against the Defendants "[i]n their [i]ndividual [c]apacities [o]nly." (Objection at 3.)

Defendants are correct that the Eleventh Amendment to the U.S. Constitution bars monetary damages actions against state officials sued in their official capacity in federal court. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Velez is therefore barred from seeking money damages against Defendants in their official capacity; however, he concedes that he seeks money damages against Defendants only in their individual capacity. Defendants' Motion to Dismiss is therefore granted to the extent that the Complaint could be read to seek money damages against Defendants in their official capacities.

### B. Excessive Force

**\*3** Defendants move to dismiss Velez's excessive force claim against McGoughan, Busalacchi, Durkin, and O'Meara for failure to state a claim because Velez does not allege that these Defendants acted with malicious or sadistic intent to cause harm. (Mem. Supp. at 8–9.) A prison official's use of force violates the Eight Amendment to the U .S .Constitution when the force used meets both an objective requirement that in the relevant context it violated "contemporary standards of decency" and a subjective requirement that the official involved had a "wanton" state of mind when engaging in the alleged conduct. *Hudson v. McMillian,* 503 U.S. 1, 5–8 (1992); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "Whether conduct was 'wanton' turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (quoting *Hudson,* 503 U.S. at 7). Factors relevant to whether the

Slip Copy, 2011 WL 1215442 (D.Conn.)

(Cite as: 2011 WL 1215442 (D.Conn.))

force used was necessary under the circumstances "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur" include the extent of the injury suffered, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " *Hudson,* 503 U.S. at 7 (quoting *Whitley v. Albers,* 475 U.S. 312, 321 (1986)).

Plaintiff's factual allegations imply sufficient wantonness so as to meet his burden to state a claim for relief under the Eighth Amendment that is plausible on its face. Defendants argue that Velez fails to allege that they acted maliciously and sadistically to cause harm,[FN1] however the Complaint contains extensive factual allegations of Defendants' use of force that, when compared to relevant indicia of wantonness, plausibly allege that Defendants acted out of malicious intent to cause Velez harm. Velez claims that although he was compliant with the Defendant Officers' directives at all times, McGoughan and Busalacchi twice sprayed his face with mace at point blank range while pulling one of his arms through the trapdoor of his cell (Compl.¶ 6); that despite his cries of pain Defendants thereafter left him in his cell without any decontamination measures for 10–15 minutes (*id.* ¶ 9–12); that Durkin and O'Meara slammed him against the wall outside his cell after handcuffing him (*id.* ¶ 13–14); that again despite his cries of pain and prison regulations requiring immediate decontamination, Defendants instead brought him to the day room at Garner (*id.* ¶ 15–18); that after finally bringing him to a shower, Langenheim slapped him in the face and Durkin, Langenheim, and O'Meara slammed him on the shower floor (*id.* ¶ 19–23); and that after returning him to the day room after decontamination, Defendants threw him on the floor once again (*id.* ¶ 24–25).

> FN1. Contrary to Defendants argument in this respect, Velez does, in Paragraph 14 of his Complaint, allege that in slamming him against the wall outside his cell, Defendants used "malicious[ ] and wanton force." He does not, however, characterize their intent as malicious, sadistic, or wanton elsewhere in the Complaint.

**\*4** Under the applicable factors in *Hudson,* 503 U.S. at 7, because Velez claims that he complied with directives and was restrained at all times during these incidents, it can readily be inferred from his allegations that the amount of force used by Defendants far exceeded the need for that force, particularly in the absence of any defined threat or any attempt to temper the severity of Defendants' treatment of Velez. Velez has accordingly "allege[d] facts from which it could be inferred that prison officials subject him to excessive force, and did so maliciously and sadistically." *Sims,* 230 F.3d at 22 (prisoner's complaint sufficiently pleaded excessive force where he alleged three separate incidents where while he was handcuffed, defendants, without provocation, punched and/or kicked him in the chest, abdomen, head, and groin); *compare Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir 1996) (prisoner's complaint alleging that prison officials " 'put [him] on lockdown,' placed him on 'full restraint' status, denied him outdoor recreation, and forced him to wear leg irons while showering" did not state a claim based on excessive force).

Velez's detailed factual allegations therefore state an excessive force claim that is plausible on its face and Defendants' motion to dismiss this claim is denied.

### C. Supervisory Liability Against Lieutenant McDonald

Defendants move to dismiss Velez's supervisory liability claim against Lieutenant McDonald arguing that it must fail as a matter of law because Velez fails to state a claim for excessive force. (Mem. Supp. at 10.) A supervisor is deemed personally involved in constitutional deprivations, and thus liable under Section 1983, where he or she "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F .3d 865, 873 (2d Cir.1995). Velez alleges in his second claim for relief that McDonald "was deliberately indifferent in supervising his subordinates who used excessive force." (Compl.¶ 40.) Because, as discussed above, Velez has presented a plausible excessive force claim, Defendants' motion to dismiss the supervisory liability claim is denied.

### D. Intentional Infliction of Emotional Distress

Defendants move to dismiss Velez's fifth claim for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1215442 (D.Conn.)

(Cite as: 2011 WL 1215442 (D.Conn.))

relief, for IIED against all Defendants, on the ground that the conduct alleged by Velez is not extreme or outrageous. (Mem. Supp. at 10–12.) In order to succeed on a claim for intentional infliction of emotional distress, a plaintiff must establish: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Id.* Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 211 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

**\*5** Velez's Complaint sets out factual allegations that, if proven, could constitute conduct "beyond on possible bounds of decency." Being maced in the face at close range while restrained and compliant, slapped and slammed against the wall and floor, and forced to sustain prolonged pain in the eyes, ears, nose, and mouth because of delayed decontamination, where a plaintiff posed no risk to the corrections officers, may be found to constitute extreme and outrageous conduct. *See Sabir v. Jowett,* 214 F.Supp.2d 226, 242 (D.Conn.2002) (denying defendant state trooper Fusaro's motion for judgment as a matter of law on plaintiff's IIED claim "where the jury could have found that Trooper Fusaro permitted the hospital security officer to pepper spray Sabir while he was in handcuffs, that he transported Sabir outside on a cold winter night wearing only socks and underwear, and that he left him in a cold cell in that condition for several hours"); *Keeney v. City of New London,* 196 F.Supp.2d 190, 202 (D.Conn.2002) (denying summary judgment for defendants who claimed that twice capstunning the restrained and motionless plaintiff was not extreme and outrageous); *see also Frappier v. City of Waterbury,* 3:07–CV–1457(WWE), 2008 WL 4980362, *3 (D.Conn. Nov. 20, 2008) ("Courts have held that the use of excessive force can establish a claim for intentional

infliction of emotional distress."). Velez has accordingly stated an IIED claim that is plausible on its face.

**IV. Conclusion**

For the reasons stated above, Defendants' Motion to Dismiss [Doc. # 10] is GRANTED as to official capacity damages claims and DENIED in all other respects.

IT IS SO ORDERED.

D.Conn.,2011.

Velez v. McDonald
Slip Copy, 2011 WL 1215442 (D.Conn.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3257667 (E.D.N.Y.)

(Cite as: 2010 WL 3257667 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

E.D. New York.
Harold EDWARDS, Plaintiff,
v.
CITY OF NEW YORK et al., Defendants.
No. 08-cv-2199 (TLM).

Aug. 16, 2010.
Nkereuwem Umoh, The Law Office of Uwem Umoh, Brooklyn, NY, for Plaintiff.

Karl J. Ashanti, The City of New York Law Department, New York, NY, for Defendants.

*MEMORANDUM RULING AND ORDER*

TUCKER L. MELANÇON, Senior District Judge.
   **\*1** Before the Court are defendants City of New York and Police Officer Mikal Wright's ("Wright") Motion for **Summary Judgment** [Rec. Doc. 53] and plaintiff's memorandum in opposition thereto [Rec. Doc. 59]. For the reasons that follow, defendants' Motion [Rec. Doc. 53] will be DENIED IN PART and DENIED AS MOOT IN PART.
**I. Defendant City of New York's Liability**

   Under the Supreme Court's holding in *Monell,* "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," and that it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff withdrew

his *Monell* claims against the City of New York, as well as his claims under New York State law, and the Court has approved and endorsed the parties' stipulation dismissing all such claims [See Rec. Doc. 52]. Thus the only claims remaining in the case before the Court are those brought under § 1983 against defendant Wright. Defendants' Motion for **Summary Judgment** as is relates to defendant City of New York will therefore be denied as moot.
**II. Plaintiff's *Terry* Stop Claim**

   Wright argues that plaintiff fails to produce evidence sufficient to show that an unlawful *Terry* stop occurred, and, alternatively, that even if an unlawful *Terry* stop occurred, he is entitled to qualified immunity as a matter of law. As set out herein, the record before the Court demonstrates that there are disputed issues of fact as to (1) whether Wright actually "seized" plaintiff for a distinct period before he arrested him, (2) whether any such seizure, if it occurred, was lawful, based on the circumstances of the situation, and (3) the applicability of qualified immunity under the circumstances.
A. The Occurrence of a Seizure

   "Only when [a police] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Seizure occurs when "under the particular circumstances presented, a reasonable person would have believed that he was not free to leave if he did not respond to the questions put to him." *Pinto-Montoya v. Mukasey,* 540 F.3d 126, 131 (2d Cir.2008) (internal quotation marks omitted).
   It is undisputed that Wright asked plaintiff what was in the bag plaintiff was holding, and at some point thereafter arrested plaintiff. The events that occurred between Wright's question and plaintiff's arrest are disputed. The question of whether plaintiff was seized at any point prior to his actual arrest cannot be divined by the Court based on the record before it, and is therefore a question of fact to be resolved by a jury or upon motion, if appropriate, at the close of plaintiff's case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3257667 (E.D.N.Y.)

(Cite as: 2010 WL 3257667 (E.D.N.Y.))

B. The Lawfulness of any Seizure that Occurred

**\*2** A police officer may legally "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *U.S. v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *see also Terry,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules," and the lawfulness of a particular stop must be evaluated by looking at "the totality of the circumstances." *Sokolow,* 490 U.S. at 7-8.

Wright alleges that plaintiff was carrying a brown paper bag that looked like it had a beer inside it, which he claims gave rise to a reasonable suspicion that plaintiff was in violation of New York City Administrative Code § 10-125(b), which makes it unlawful to "possess, with intent to drink or consume, an open container containing an alcoholic beverage" in a public place. Plaintiff asserts that while he testified during his deposition that "the guy in the store twisted [his gyro sandwich] like a beer," the bag he was holding did not look like it had an *open* container, and no reasonable officer would have suspected, from the totality of the circumstances, that he was in violation of New York City law. Plaintiff's admission that the sandwich was "twisted ... like a beer," whatever that actually means, is not sufficient to establish, as a matter of law, that Wright had reason to suspect that plaintiff possessed an open container of alcohol with intent to drink it. Wright's actions based on what he contends he observed on the scene, and whether what he observed amounted to a reasonable suspicion, based on plaintiff's deposition testimony, are material issues of disputed fact on which **summary judgment** may not be granted and must be resolved by a jury.

C. Qualified Immunity

"A government official is entitled to qualified immunity from suit for actions taken as a government official if ... the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000). "**Summary judgment** on

qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness," *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999), as is the situation in the case at bar. Therefore, Wright's Motion for **Summary Judgment** on plaintiff's *Terry* stop claim on qualified immunity grounds must be denied.

**III. Plaintiff's False Arrest Claim**

Wright argues that plaintiff fails to produce evidence sufficient to show that an unlawful arrest occurred, and, alternatively, that even if an unlawful arrest occurred, Wright is entitled to qualified immunity as a matter of law. As set out herein, the record before the Court demonstrates that there are disputed issues of fact as to (1) whether Wright had probable cause to arrest plaintiff, and (2) the applicability of qualified immunity.

A. Probable Cause

**\*3** A § 1983 claim for false arrest derives from the Fourth Amendment right to remain free from arrest absent probable cause, and is evaluated, where the underlying arrest occurred in New York, according to New York law. *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006). Under New York law, probable cause exists when an officer "has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 152 (internal quotation marks omitted).

Wright argues that he had probable cause to arrest plaintiff, either for unlawful possession of marijuana, for disorderly conduct (New York Penal Law § 240.20 states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [i]n a public place, he uses abusive or obscene language"), or for criminal possession of a weapon.

It is undisputed that marijuana was found on plaintiff when he was searched at the police station, but it has not been established that Wright or any other police officer found marijuana on plaintiff before he was arrested, which is the only time period relevant for the purposes of a false arrest claim. It is also undisputed that plaintiff "used profane language" at some point during the incident, but

Slip Copy, 2010 WL 3257667 (E.D.N.Y.)

(Cite as: 2010 WL 3257667 (E.D.N.Y.))

plaintiff's admission that he "used profane language" is not sufficient to establish that Wright had probable cause to arrest him for disorderly conduct, as it does not in itself suggest that plaintiff either "inten[ded] to cause public inconvenience, annoyance or alarm," or "recklessly creat[ed] a risk thereof." Finally, it is undisputed that plaintiff took possession of Wright's baton at some point, but it has not been established whether plaintiff swung the baton menacingly, as Wright claims, or helpfully picked it up and handed it to Wright, as plaintiff claims. The existence of probable cause for plaintiff's arrest is therefore a question of fact to be resolved by a jury.

B. Qualified Immunity

"Arguable probable cause, which establishes qualified immunity with respect to a false arrest claim, exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Droz v. McCadden,* 580 F.3d 106, 109 (2d Cir.2009) (internal brackets omitted). "**Summary judgment** on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999).

A determination as to whether a reasonable officer could have believed probable cause existed under the specific circumstances of this case cannot be made based on the record currently before the Court, as there are disputes as to genuine issues of material fact. The Court will therefore deny **summary judgment** on plaintiff's false arrest claim based on qualified immunity grounds.

IV. Plaintiff's Excessive Force Claim

A. Reasonableness of Force Used

**\*4** "The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable in

light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Id.* (internal quotation marks and brackets omitted).

The amount of force, if any, that Wright used in this case has not, based on the record before the Court, been established. Bizarrely, *plaintiff* testified during his deposition that *no force* was used at all by any police officer, Edwards Dep. 142-44, but *Wright* testified during his deposition that he "drew [his] weapon on [plaintiff]," Wright Dep. 14, and another police officer, Ray Jenkins, testified that Jenkins "sprayed **mace** on [plaintiff]" and that Wright and Jenkins together "grappled [plaintiff] to the ground." Jenkins Dep. 11. Further, the New York City Police Department record of plaintiff's arrest states that force was used, in the form of a "chemical agent." Ashanti Decl., Exh. G. The amount and type of force employed, and its reasonableness under the circumstances, are questions of fact to be resolved by a jury based on the evidence adduced at trial, and Wright's Motion for **Summary Judgment** on plaintiff's **excessive force** claim as it relates to the reasonableness of the force used will be denied.

B. Qualified Immunity

As discussed in Sections II.C and III.B, *supra,* qualified immunity hinges on whether Wright's "action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken," *see Cuoco,* 222 F.3d at 109, and **summary judgment** should not be granted thereon where "there are facts in dispute that are material to a determination of reasonableness." *See Thomas,* 165 F.3d at 143. The reasonableness of Wright's use of force, if any, cannot be evaluated based on the record, and his Motion for **Summary Judgment** on plaintiff's excessive force claim based on qualified immunity will therefore be denied.

V. Plaintiff's Malicious Prosecution Claim

To state a § 1983 claim for malicious prosecution, a "plaintiff must allege the four elements of malicious prosecution under New York state law and the deprivation of a constitutional right. The elements of malicious prosecution under New York law are (1) that the

Slip Copy, 2010 WL 3257667 (E.D.N.Y.)

(Cite as: 2010 WL 3257667 (E.D.N.Y.))

defendant commenced a criminal proceeding against the plaintiff; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the initiation or continuation of the proceeding; and (4) that the defendant acted with malice." *Ramos v. City of New York,* 298 Fed.Appx. 84, 85 (2d Cir.2008). "[A] § 1983 claim is subject only to the notice pleading requirements of Fed.R.Civ.P. 8. That is to say, all it must contain is 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Charles W. v. Maul,* 214 F.3d 350, 357 (2d Cir.2000) (quoting Fed.R.Civ.P. 8(a)(2)).

**\*5** Wright's first argument, that plaintiff does not allege the elements of malicious prosecution in his Amended Complaint, fails. Plaintiff's Amended Complaint contains a claim that Wright commenced a criminal proceeding against plaintiff. *See* Am. Compl. ¶¶ 13-15 ("The officers arrested the plaintiff ... he was also charged with unlawful possession of marijuana ... he was taken to central booking ... [he] was later taken before a judge, and some 6 months later all charges were dropped against him."), 21 ("defendants ... deprived plaintiff of his ... [right] to be free from ... malicious prosecution"). The Complaint contains an assertion that the proceeding was terminated in plaintiff's favor, *see id,* and an assertion that there was no probable cause for plaintiff's arrest, *see id.* at ¶ 15 ("even though the defendant police officers knew [or] should have known based on the facts that no crime had been committed, they still proceeded to arrest plaintiff"). The Complaint contains also an assertion that Wright acted with malice. *See id.* at ¶¶ 21 ("defendants ... deprived plaintiff of his ... [right] to be free from ... malicious prosecution"), 28 ("Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights"). Finally, the complaint contains an assertion that plaintiff was deprived of a constitutional right. *See id.*

Wright's argument that probable cause existed, as a matter of law, for the initiation of the prosecution also fails. According to the Certificate of Disposition issued on July 15, 2008, plaintiff was charged with five offenses at his arraignment: (1) Second degree menacing (N.Y. Penal Law § 120.14); (2) Disorderly conduct (N.Y. Penal Law § 240.20); (3) Second degree harassment (N.Y. Penal Law § 240.26); (4) Third degree attempted assault (N.Y. Penal

Law § 110-120.00); and (5) Fourth degree attempted criminal possession of a weapon (N.Y. Penal Law § 110-265.01). *See* Ashanti Decl., Exh. I. The record before the Court does not establish that Wright had probable cause to initiate prosecution of plaintiff for all of these five offenses; to establish as much would require a determination of several of the unresolved issues of fact set out hereinabove, as well as others not currently before the Court or addressed in this Ruling.

Finally, Wright's argument that he cannot be found liable for malicious prosecution because the prosecutor, and not he, initiated the prosecution, also fails. "[T]he public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false." *White v. Frank,* 855 F.2d 956, 962 (2d Cir.1988). Wright was the complaining witness, *see* Ashanti Decl., Exh. F, and the question of whether the information he reported in his complaint, which led to plaintiff's prosecution, was "knowingly and maliciously false" hinges on several of the unresolved issues of fact previously discussed herein.

**\*6** Wright's Motion for **Summary Judgment** on plaintiff's malicious prosecution claim will therefore be denied.

**IV. Conclusion**

Based on the foregoing, it is

**ORDERED** that defendants' Motion for **Summary Judgment** [Rec. Doc. 53] is **DENIED AS MOOT** with respect to all claims against defendant City of New York, and **DENIED** with respect to all claims against defendant Mikal Wright.

**SO ORDERED.**

E.D.N.Y.,2010.

Edwards v. City of New York
Slip Copy, 2010 WL 3257667 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ruben SLACKS, Plaintiff,
v.
GRAY, Correctional Officer, Eastern N.Y. Correctional
Facility; C.O. Farrell; C.O. Hauck; Sgt. Fischer; R.N.
Anthony, Defendants.
No. 9:07-CV-510 (NAM/GJD).

Sept. 29, 2009.
West KeySummary**Prisons 310** 🔑 192

310 Prisons

    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H** 🔑 1546

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
    A prison staff nurse was not deliberately indifferent to
an inmate's medical needs as there was no evidence that
his medical needs were serious. The prison record stated
that the inmate would not answer any of the nurse's
questions, and that she did not observe any abrasions,
contusions, or lacerations. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.
Ruben Slacks, Napanoch, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Shoshanah V. Bewlay, Christina L. Roberts-Ryba,
Asst. Attorneys General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.
    **\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983 for civil rights violations
stemming from an alleged assault by defendants Gray,
Farrell, and Fischer. Plaintiff claims that defendant Hauck
was present during the assault but failed to intervene.
Plaintiff also claims he was denied medical care by
defendant Nurse Anthony, was deprived of clothing and
toilet paper overnight, and was later improperly charged
with misbehavior to cover up the assault.

    Defendants moved (Dkt. No. 48) for summary
judgment dismissing the action. Upon referral pursuant to
28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United
States Magistrate Judge Gustave J. DiBianco issued a
Report and Recommendation (Dkt. No. 52) recommending
that the motion be granted in its entirety.

    Plaintiff has submitted an objection (Dkt. No. 53). In
view of the breadth of plaintiff's objections, the Court
conducts a *de novo* review of all issues pursuant to 28
U.S.C. § 636(b)(1)(C).

    A party moving for summary judgment bears the
initial burden of demonstrating that there is no genuine
issue of material fact and that it is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v.
Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986). If the Court, viewing the evidence in the light
most favorable to the nonmovant and drawing all
reasonable inferences in nonmovant's favor, determines
that the movant has satisfied this burden, the burden then
shifts to the nonmovant to adduce evidence establishing
the existence of a genuine issue of material fact requiring
a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A
genuine issue of material fact exists if the evidence is such
that "a reasonable [factfinder] could return a verdict for
the nonmoving party." *Id.* at 248. If the nonmovant fails to
carry this burden, summary judgment is appropriate. *See
Celotex,* 477 U.S. at 323-24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

Through consistent evidence, including medical records and defendants' declarations, defendants have carried their initial burden of showing that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Although plaintiff disputes some of defendants' evidence, the Court agrees with Magistrate Judge DiBianco that this is one of the rare cases in which plaintiff's allegations throughout the record are so inconsistent that no reasonable factfinder could find in his favor. Plaintiff gives multiple versions of the events-in his disciplinary hearing testimony, his grievance, his interview in connection with the grievance investigation, his complaint in the instant action, his deposition in the instant action, and his interview with a psychologist from the Office of Mental Health-which are so inconsistent and contradictory that no reasonable juror could believe them. Further, plaintiff's allegations are contradicted by the portions of the medical records that plaintiff does not dispute. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court determines that no reasonable juror could return a verdict for plaintiff. Thus, plaintiff has failed to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial.

*2 It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Judge Gustave J. DiBianco (Dkt. No. 52) is adopted in full; and it is further

ORDERED that defendants' motion (Dkt. No. 48) for summary judgment is granted and the action is dismissed with prejudice.

IT IS SO ORDERED.

## REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he was assaulted by defendants Gray, Farrell, and Fischer, while defendant Hauck watched, but failed to intervene. Plaintiff also claims that he was denied medical care by defendant Nurse Anthony, and that plaintiff was deprived of clothing and toilet paper over night. Plaintiff also alleges that he was later improperly charged with misbehavior to cover up the assault. Compl. (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.49, 51). For the following reasons, this court will recommend granting the summary judgment motion and dismissing plaintiff's complaint in its entirety as against all defendants.

## DISCUSSION

1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

**\*3** The Local Rules of the Northern District of New York provide that a motion for summary judgment shall include a Statement of Material Facts, "containing each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." LOCAL RULES NDNY 7.1(a)(3). The "record" for purposes of the Statement of Material Facts includes the "pleadings, depositions, answers to interrogatories, admissions, and affidavits." *Id.* The Second Circuit has held, however, that in determining whether the moving party has met its burden, the court may not rely solely on the statement of undisputed facts, it must be satisfied that the citation to evidence in the record supports the assertion. *Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the moving party fails to meet its burden, the court must deny summary judgment even if the opposing party does not present any opposing evidentiary matter. *Id.* (citation omitted).

However, if the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to

respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

**2. Facts**[FN1]

> [FN1.] On August 27, 2008, Chief Judge Mordue denied plaintiff's motion for summary judgment. (Dkt. No. 47). This court has adopted the facts as stated in Judge Mordue's order and has added the evidence that has been presented in the defendants' papers.

Plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), claims that on December 3, 2006, he was on his way to the yard at Eastern Correctional Facility (Eastern), when Corrections Officer (CO) True stopped plaintiff and told him that he was going to be "pat-frisked." Compl. ¶ 1. Plaintiff states that after the frisk was completed by Officers True and Olszewski, plaintiff noticed that one of his bags was not returned to him. Compl. ¶ 2. When plaintiff inquired about the bag, CO True told plaintiff that the bag was contraband. *Id.* Plaintiff states that when he questioned CO True's statement, plaintiff was told that he had "too much of an attitude" and was going to be sent back to his cell. *Id.* Plaintiff states that he was escorted back to his cell by CO True. *Id.* Plaintiff claims that when they got back to the cell block, CO True told plaintiff that he was going to be keeplocked,[FN2] however, the block officer told CO True that he was going to have to "lock [plaintiff] in himself because there were no other officers on the block to do so." Compl. ¶ 3. As a result, plaintiff states that he was taken "up the stairs" to a different area and "locked in" by CO True. *Id.* Plaintiff claims that at approximately 10:20 a.m., the cell door opened, he was handcuffed, and escorted to the Special Housing Unit (SHU) by defendant Fisher and three other officers who have not been named as defendants. *Id.*

> [FN2.] The term "keeplock" refers to disciplinary or administrative confinement in which an inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

**\*4** Plaintiff claims that when they arrived at SHU, he

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

saw various officers, including defendants Gray, Farrell, and Hauck. *Id.* Plaintiff states that he noticed that defendant Gray was putting on, what appeared to be, leather gloves. *Id.* Plaintiff states he was then told to follow defendant Gray into the "frisk room," accompanied by defendants Fisher and Farrell while defendant Hauck stood in the doorway. *Id.* Once inside the "frisk room," plaintiff claims that he was told to place his hands up against the wall, and his glasses were taken away from him by defendant Gray. Compl. ¶ 4. Plaintiff then describes how defendant Gray began punching plaintiff until plaintiff fell to the ground, where plaintiff was "slapped in [the] head and kicked in [the] back, buttocks, and leg area" by defendants Fisher and Farrell. *Id.* Defendant Hauck allegedly stood by and watched the assault without intervening to stop the abuse.

Plaintiff claims that when the beating stopped, defendant Fisher told plaintiff to get up, but plaintiff could not comply with the order because the beating aggravated plaintiff's back injury. Compl. ¶ 5. Plaintiff claims that defendant Fisher stated that defendant Nurse Anthony told him that there was nothing wrong with plaintiff's back, and then defendant Fisher kicked plaintiff in the back again. *Id.* Plaintiff claims that the abuse continued as defendant Farrell dragged plaintiff on the floor and then picked plaintiff up and "slammed" him against the wall. *Id.* Plaintiff claims that defendant Nurse Anthony was called, but that she did not give plaintiff any medical care, rather, she just looked at him and stated "that's a refusal." *Id.*

Plaintiff states that ultimately his clothes were taken away from him and he was forced to spend the night with no clothes and no toilet paper. Plaintiff states that after the incident on December 3, 2006, Nurse Nordé visited plaintiff and asked if he was injured. Compl. ¶ 4. Plaintiff claims that he told Nurse Nordé that he was injured, and although she asked if he wanted medication for the pain, plaintiff told the nurse that he already had a prescription for pain medication, so she only gave him Bacitracin for the laceration on his elbow. *Id.*

Plaintiff states that the next day, someone from "Mental Health" came to visit plaintiff to interview him. Compl. ¶ 6. Plaintiff claims that this individual told plaintiff that defendant Fisher reported that plaintiff was

going to kill himself. *Id.* Plaintiff claims that when he told the mental health professional that the statement was a lie, the clinician told the officer to immediately give plaintiff back his clothes. *Id.* Plaintiff states that despite this order, he did not get his clothes, mattress, sheets, and blanket back until approximately five hours later. *Id.* Plaintiff also claims that he told Superintendent Brown about the incident, but that Superintendent Brown told plaintiff that his officers did not "beat up on inmates." Compl. ¶ 7.

**\*5** Plaintiff states that Sergeant Green came to take photographs of his injuries. Plaintiff claims that he was given two fabricated misbehavior reports, one of which alleged that plaintiff banged his own head against the wall during the frisk. *Id.* Plaintiff names CO George Gray; CO Thomas Farrell; Sergeant Ronald D. Fisher; Lt. Raymond Hauck; and Nurse Nancy Anthony as defendants.

Defendants' description of the events of December 3, 2006 is very different than plaintiff's statement. The defendants all agree that plaintiff was escorted to the SHU on December 3, 2006 [FN3]. (Fisher Decl. ¶ 7; Farrell Decl. ¶ 4; Gray Decl. ¶ 7). Defendant Gray states that when inmates are admitted to SHU, they are "strip frisked" and searched with a metal detector. (Gray Decl. ¶ 6). Defendant Gray explains that the

> FN3. Defendant Gray's declaration states that plaintiff was escorted to the SHU on December 3, 2008. (Gray Decl. ¶ 7). This incorrect date appears to be a typographical error. There is no debate that plaintiff's allegations relate to events that occurred on December 3, 2006.

purpose of the strip frisk is to maintain security and insure that there are no weapons or contraband on the inmate. A strip frisk involves the inmate placing their hands on the wall and then following the directions to remove clothing. After the strip frisk is conducted, a nurse is called into the room in order to examine the inmate.

*Id.* Defendant Fisher states that when inmates are admitted to SHU, they are also screened for Suicide Prevention. (Fisher Decl. ¶ 6). The screening consists of asking the inmate a series of questions. (Fisher Decl. ¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

6).

## A. Defendant Gray

Defendant Gray states that upon plaintiff's arrival in SHU, plaintiff was taken to the SHU frisk room, and his restraints were removed. (Gray Decl. ¶ 8). Plaintiff was then ordered to place his hands on the order. *Id.* Plaintiff refused to comply with the order, claiming that he could not comply because of a back injury. (Gray Decl. ¶ 9; Fisher Decl. ¶ 8). Plaintiff was again ordered to place his hands on the wall, but instead, he started to bang his head on the wall and fell to the floor. (Gray Decl. ¶ 10). Plaintiff was ordered to stand up and comply with the frisk procedure, but he refused. (Gray Decl. ¶ 11). Defendant Gray states that defendant Hauck then ordered the plaintiff to comply with the order to get up and place his hands on the wall, and plaintiff complied. (Gray Decl. ¶ 12). Defendant Gray states that defendant Nurse Anthony came to SHU to examine the plaintiff, but the plaintiff refused to speak to her. (Gray Decl. ¶ 13).

Defendant Gray states that he did not kick or hit plaintiff at any time during the incident. (Gray Decl. ¶ 16). Defendant Gray also states that if he had witnessed "any sort of assault on the plaintiff," an unusual incident report would have been filed. (Gray Decl. ¶ 17). Defendant Gray states that "there was no assault on the plaintiff whatsoever." (Gray Decl. ¶ 18).

## B. Defendant Fisher

Defendant Fisher states that he heard plaintiff refuse to comply with the strip frisk because of a "bad back." (Fisher Decl. ¶ 8). Plaintiff "continued to refuse the strip frisk and he began to bang his head against the wall." (Fisher Decl. ¶ 9). Defendant Fisher states that he observed plaintiff fall to the floor, and then refuse several orders to comply with the frisk procedures. (Fisher Decl. ¶ 10). Defendant Fisher then ordered plaintiff to comply with proper procedures, while the other officers attempted to help plaintiff get on his feet. (Fisher Decl. ¶ 11). Defendant Fisher observed defendant Hauck order the plaintiff to stand up, and plaintiff complied. (Fisher Decl. ¶ 12-13). Defendant Fisher then questioned the plaintiff about whether he had any injuries "from banging his head on the fall to the floor." (Fisher Decl. ¶ 14). Defendant Fisher claims that plaintiff stated that he had no injuries. (Fisher Decl. ¶ 15).

**\*6** Defendant Fisher then completed the "Suicide Prevention Screening Guidelines-SHU Admission Form." (Fisher Decl. ¶ 17 & Ex. A). Defendant Fisher states that "[i]n response to questions such as, 'Are you feeling suicidal' or 'Do you feel there is nothing to look forward to in the future', plaintiff responded, 'Yes.' " (Fisher Decl. ¶ 18). Defendant Fisher noted on the form "that plaintiff appeared to be under the influence of alcohol or drugs, was incoherent or otherwise acting in an abnormal manner." (Fisher Decl. ¶ 19). Plaintiff was placed on suicide watch "due to his claims of possible harm," and that the Mental Health Unit was notified. (Fisher Decl. ¶ 20). Plaintiff remained on suicide watch until December 4, 2006. (Fisher Decl. ¶ 21(a) [FN4]). Defendant Fisher states plaintiff continued to behave abnormally throughout the evening. (Fisher Decl. ¶ 21(b)).

> [FN4.] Defendant Fisher's Declaration includes two paragraphs labeled Number 21. For purposes of this Order, the court labels the first one "(a)", and the second one "(b)".

Plaintiff reported injuries to a nurse at approximately 7:30 p.m. on December 3, 2006. (Fisher Decl. ¶ 22). Plaintiff claimed that he had injuries to his right rib cage and right elbow, inflicted by C.O. Gray.[FN5] (Fisher Decl. ¶ 23). Defendant Fisher states that he notified another corrections officer, who then attempted to photograph plaintiff's injuries, but plaintiff refused to leave his cell. (Fisher Decl.¶¶ 25, 26). The photographs were taken the following day. (Fisher Decl. ¶ 27). Defendant Fisher states that he was present for the entire strip frisk procedure on December 3, 2006, and that plaintiff was never hit by defendant Gray or any other corrections officer. (Fisher Decl. ¶ 29).

> [FN5.] In his declaration, defendant Fisher states that plaintiff complained of injuries "sustained *by* C.O. Gray," (Fisher Decl. ¶ 23) however, it is clear that plaintiff was complaining about his own injuries. There is no indication that defendant Gray suffered any injuries.

## C. Defendant Farrell

Defendant Farrell states that plaintiff was taken to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

strip frisk room, and that plaintiff refused to place his hands on the wall after the restraints were removed. (Farrell Decl. ¶ 5-6). Defendant Farrell states that plaintiff stated he could not put his hands on the wall because of a back injury. (Farrell Decl. ¶ 6). Defendant Farrell agrees with the other defendants that plaintiff refused a second order to comply, began banging his head on the wall, fell to the floor, and then began banging his head on the floor. (Farrell Decl. ¶ 7). Plaintiff continued to refuse orders to stand up until defendant Hauck gave the order to do so. (Farrell Decl. ¶ 8-9). Defendant Farrell states that plaintiff refused to speak with defendant Nurse Anthony when she arrived to examine plaintiff. (Farrell Decl. ¶ 10).

Defendant Farrell wrote a misbehavior report against plaintiff, charging him with "violating direct orders and frisk procedures." (Farrell Decl. ¶ 11). At the Tier III disciplinary hearing, plaintiff admitted that he banged his head on the floor and the wall. (Farrell Decl. ¶ 15). Defendant Farrell states that he never hit or kicked the plaintiff during the incident, and that "there was no assault on the plaintiff whatsoever." (Farrell Decl. ¶¶ 21, 22).

**D. Defendant Hauck**

**\*7** Defendant Hauck has been a Corrections Lieutenant at Eastern Correctional Facility since 2003 and has been employed by DOCS for over 25 years. (Hauck Decl. ¶¶ 2, 3). Defendant Hauck's duties include supervising all lower-ranking uniformed officers, serving as a Watch Commander, and supervising all Sergeants and Officers on a given shift. (Hauck Decl. ¶ 4). On December 3, 2006, defendant Hauck was working the day-shift at the facility. (Hauck Decl. ¶ 6). Defendant Hauck states that in order to refresh his recollection regarding this incident, he reviewed a memorandum he wrote to Captain Leghorn regarding plaintiff. *Id.* & Ex. B.[FN6] Defendant Hauck recalls that on arrival at the SHU, plaintiff "was very argumentative, [and] refused to comply with the strip frisk claiming he had back problems." (Hauck Decl. ¶ 8). Defendant Hauck states that

> [FN6.] Exhibit B to defendant Hauck's declaration is a copy of the memorandum that he wrote to Captain Leghorn.

At the time the plaintiff was admitted to SHU, no staff struck him. In fact the staff stopped the plaintiff from

banging his head on the wall. The plaintiff then let himself fall to the floor, claiming his back went out. Once on the floor he began banging his head on the floor. The Officers attempted to stop him from doing this.

(Hauck Decl. ¶ 9). Defendant Hauck states that if he witnessed an assault on an inmate, he would immediately intervene to stop the assault. (Hauck Decl. ¶ 10). Defendant Hauck states that "at no time was the plaintiff assaulted by Correction Officers." (Hauck Decl. ¶ 11). Defendant Hauck asserts that any injuries that the plaintiff sustained on December 3, 2006 were related to his own "destructive behavior." (Hauck Decl. ¶ 12).

**E. Defendant Nurse Anthony**

Defendant Anthony is a registered nurse, who has been employed by DOCS for 18 years. (Anthony Decl. ¶ 2). Some of defendant Anthony's duties include examining inmates when they are admitted to SHU if requested to do so by the security staff. (Anthony Decl. ¶ 4). Defendant Anthony states when an inmate is being admitted to SHU, he is first strip-frisked by the officers, and then if there is no incident, the inmate is routinely examined by a nurse that is working the evening shift. (Anthony Decl. ¶¶ 5-6). Sometimes, however, a nurse is called into SHU during the day in order to examine an inmate. *Id.* ¶ 6.

When defendant Anthony examines an inmate admitted to SHU, she asks a series of questions regarding the inmate's general health, whether the inmate has allergies, whether he is taking any medications, and whether he has any injuries. (Anthony Decl. ¶ 7). Defendant Anthony states that if she notices that an inmate has injuries or claims that he has been physically assaulted, she notes the injuries in the inmate's Ambulatory Health Record (AHR). *Id.* ¶ 8.

In this case, defendant Anthony states that she examined plaintiff on December 3, 2006 at approximately 11:05 a.m. (Anthony Decl. ¶ 10). Defendant Anthony states that plaintiff refused to answer any of her questions. (Anthony Decl. ¶ 11). The excerpt of plaintiff's AHR submitted with defendant Anthony's declaration shows that defendant Anthony documented plaintiff's examination, noting "no abrasions, contusions, or lacerations." (Anthony Decl. ¶¶ 11-12 & Ex. A) (AHR entry dated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

12/3/06 at 11:05 a.m.). The AHR shows that Nurse Nordé examined plaintiff at approximately 7:10 p .m. (Anthony Decl. ¶ 13 & Ex. A) (AHR entry of 12/3/06 at 7:10 p.m.). Nurse Nordé documented a "small laceration R elbow," and stated that plaintiff complained of pain in his right ribs. *Id.* Nurse Nordé cleansed the laceration with iodine and issued plaintiff some bacitracin ointment. *Id.* She also wrote that she would order an x-ray for plaintiff the following morning. *Id.* She noted that although plaintiff had no history of hypertension, his blood pressure was 140/102, and she would be checking the blood pressure two times per week while he was in SHU. *Id.*

**\*8** On December 4, 2006, a DOCS employee photographed plaintiff. (Fisher Decl. Ex. C at 1). The first four photographs show plaintiff standing in boxer shorts. (Fisher Decl. Ex. C at 2). The last two photographs are close-up photographs of the small laceration on plaintiff's left elbow, and a view of plaintiff's right side. (Fisher Decl. Ex. C at 3). The photograph of plaintiff's right side show plaintiff pointing at some red marks on his upper right rib cage. *Id.*

A form titled "X-Ray Requisition and Report" shows that Nurse Nordé ordered an x-ray of plaintiff's right ribs. (Anthony Decl. Ex. C). On December 12, 2006, the radiologist wrote that three views of the right rib cage "show[ ] no recent displaced right rib fracture. Right lung expanded & no right pleural effusion. IMP: NO RECENT DISPLACED RIGHT RIB FRACTURE SEEN." *Id.*

Defendant Anthony concludes that plaintiff caused his own injuries while he was in the SHU cell on December 3, 2006. (Anthony Decl. ¶ 18). Defendant Anthony bases her opinion on the fact that plaintiff had no injuries when defendant Anthony examined him at 11:05 a.m., but when Nurse Nordé examined him again at 7:10 p.m., he had a small laceration on his elbow. *Id.*

**3. *Medical Care***

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97

S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*9** Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff's only claim against defendant Anthony is that she did not give him any medical care after the alleged assault. Compl. ¶ 5. The entire claim consists of one sentence in the complaint, stating that when defendant Anthony finally arrived in the room, she looked at plaintiff, stated "that's a refusal," and left. *Id.* Defendant Anthony states that plaintiff refused to answer any questions regarding his condition which would be consistent with her making the comment that plaintiff attributes to her. The medical records are also consistent with defendant Anthony's statement. The AHR entry for 11:05 a.m. on December 3, 2006 merely states that defendant Anthony was asked by "security" to examine plaintiff, but he refused to answer any questions. (Anthony Decl. Ex. A). Her "assessment" was that she observed no abrasions, contusions, or lacerations. *Id.*

In his response to defendants' motion, plaintiff claims that to the extent that the medical records show that Nurse Anthony provided plaintiff medical attention on December 3, 2006, defendant Anthony must have falsified this information.[FN7] (Dkt. No. 49 at ¶ 5). It is unclear what plaintiff means by "medical attention," but defendant

Anthony only recorded what she observed. Assuming that she made the observation that there were no abrasions, contusions, or lacerations, then no "medial attention" was required. There is no claim by defendant Anthony that she did anything else.[FN8] Thus, plaintiff's accusation that defendant Anthony must have falsified records is completely unfounded.

FN7. The court notes that in defendants' reply, they argue that plaintiff failed to properly respond to the defendants' motion. (Dkt. No. 51). They argue that plaintiff did not match his numbered paragraphs to the paragraphs in defendants' statements, and that plaintiff did not cite to specific portions of the record. *Id.* Defendants stated that for this reason, the defendants' Statement of Material Facts" should be deemed admitted. *Id.* The court need not decide this issue, particularly since plaintiff is *pro se,* the court has considered plaintiff's response, and finds that even considering his response, he has not raised a genuine issue of material fact.

FN8. Plaintiff seizes upon one of the statements in defendant Anthony's declaration that plaintiff believes indicates that defendant Anthony claims to have visited plaintiff again at 7:10 p.m. (Anthony Decl. ¶ 18). Defendant Anthony states that "[d]ue to the fact that when I examined plaintiff at 11:05 AM on December 3, 2006, the plaintiff had no injuries and *subsequent to my examination the same day at 7:10 PM,* the record indicates that plaintiff had a small laceration to his elbow...." Plaintiff interprets the highlighted words as defendant Anthony's claim that *she* examined plaintiff at 7:10 p.m. Although the sentence could be interpreted this way because the sentence itself is unclear, *there is no claim by defendant Anthony that she examined plaintiff at 7:10 p.m.* Nurse Anthony has stated, and the documents attached to her declaration confirm, that it was Nurse Nordé who examined plaintiff at 7:10 p.m. (Anthony Decl. ¶ 13 & Ex. A).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

In his response to defendants' motion, plaintiff also states that defendant Anthony's behavior was "way below professional" and was in violation of DOCS regulations governing the administration of treatment to inmates. *Id.* ¶ 11. Even assuming that defendant Anthony's behavior was "unprofessional," negligent, or in violation of DOCS rules,[FN9] this would not rise to the level of a constitutional claim. As stated above, negligence is not actionable under section 1983. *Estelle,* 429 U.S. at 107.

        FN9. This court makes no such finding.

**\*10** Based on the evidence in plaintiff's medical records and by plaintiff's own testimony, this court does not find that there was any "serious medical need" to satisfy the first prong of the Eighth Amendment analysis. During his deposition, plaintiff stated that his claim against defendant Anthony is that she denied him medical attention because "she come there, look at me, didn't ask me any questions and leave." Deposition Transcript (DT) at 103 (Dkt. No. 48, Roberts-Ryba Aff. Ex. A). Plaintiff stated that as far as he was concerned, the cut on his elbow was a "serious medical need" because he was bleeding. (DT at 103). Plaintiff later stated that he believed that his elbow laceration was serious because "if a person stay bleeding, he die" (DT at 105).

Although plaintiff claims that defendant Anthony did not give him "medical attention" when she saw him at 11:05 a.m. on December 3, 2006, he admitted during his deposition that at 7:10 p.m. the same day, Nurse Nordé gave him proper medical care. (DT at 104). This "proper medical care" consisted of cleansing a "small laceration" with iodine, issuing plaintiff some bacitracin ointment, and ordering x-rays [FN10] based on plaintiff's complaint of pain in his right rib area. (Anthony Decl. Ex. A). There is no notation by Nurse Nordé that plaintiff had been bleeding extensively or bleeding at all. The laceration was ***small*** and required only cleansing and antibiotic ointment.

        FN10. The x-ray requisition report shows that the x-rays were ordered on "12/3/06," the same date as the incident. (Anthony Aff. Ex. C).

The SHU Entrance Form, completed by Nurse Nordé shows that plaintiff had a history of back pain, and he was already receiving prescription pain medication for his back. (Anthony Decl. Ex. B). Plaintiff testified that Nurse Nordé asked him whether he needed some pain medication for the pain in his rib, but plaintiff refused, stating that he did not need any more pain medication since he already had some for his preexisting "back problem." (DT at 104). Plaintiff had x-rays taken on December 12, 2006, and the x-ray report stated that there were no fractures, the right lung was expanded, and there was no right pleural effusion.[FN11] (Anthony Decl. Ex. C).

        FN11. Pleural effusion is an accumulation of excess liquid in the lung, which can be caused by trauma. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 489-93 (18th Ed.2006).

While plaintiff argues that x-rays would not show if the consistent punching had bruised plaintiff, he stated at his deposition that did not sustain any internal injuries. (DT at 105). Plaintiff stated that he knew that his ribs were "bruised" because there was a "red mark." (DT at 112). However, he also stated that although the red mark lasted two to three days, it never "bruised" at all. (DT at 112). Photographs taken of plaintiff on December 4, 2006 confirm that there was no serious bruising. (Fisher Decl. Ex. C at 3).

In *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006), the Second Circuit held that the objective prong of the Eighth Amendment standard requires the court to examine how the defendant's conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the plaintiff. In this case, there is no evidence that defendant Anthony's conduct was "inadequate." However, it is also clear that a condition of urgency did ***not*** exist for which the denial of medical treatment could have resulted in further significant injury or the unnecessary and wanton infliction of pain.

**\*11** Despite plaintiff's statement that if one continues to bleed, one will die, there is no indication that plaintiff's bleeding, if any, was so severe. Neither the painful rib area, for which plaintiff himself admits he had sufficient pain medication, nor the laceration on his elbow were conditions that could produce death, degeneration or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

extreme pain. The medical records and plaintiff's own testimony support this finding. Plaintiff testified that after the x-rays, he did not request any follow-up medical care for his injuries, his "red mark" lasted only a couple of days. (DT at 95, 112).

Thus, plaintiff has failed to produce any evidence to contradict the sworn statement of defendant Anthony, corroborated by the clear medical evidence showing that plaintiff did not sustain more than a *de minimis* injury. The medical evidence includes the report of Nurse Nordé, who plaintiff admits gave plaintiff "proper medical care." If the "proper medical care" consisted of cleansing the minor laceration on plaintiff's elbow and issuing some bacitracin ointment, then plaintiff did not have a "serious medical need" within the meaning of the Eighth Amendment.

Finally, regarding the alleged rib injury, the most that Nurse Anthony could have done was schedule x-rays, which were still scheduled for plaintiff the same day by Nurse Nordé. The x-rays confirmed that plaintiff had no rib injury, and no injury to his lung. Plaintiff testified that he had no internal injuries, and the "red mark" disappeared in approximately two days. There is absolutely no evidence to show that plaintiff had a "serious medical need" to which defendant Anthony could have been "deliberately indifferent." Because the court has determined that plaintiff did not have a serious medical need, it need not reach the second prong [FN12] of the Eighth Amendment analysis, and the complaint may be dismissed as against defendant Anthony.

FN12. Defendant Anthony's alleged actions, consisting of her statement that plaintiff's behavior constituted a "refusal" of care, justifying her failure to afford him proper medical care, would be part of the second prong of the Eighth Amendment test. If plaintiff had no "serious medical need," then defendant Anthony's attitude is no longer relevant to the analysis. Having said this, however, the court would point out that at plaintiff's disciplinary hearing, he testified that after the incident, the defendant officers told plaintiff that they had called the nurse, and plaintiff said "nothing's wrong. *I refuse.*" (Farrell Decl. Ex. B at 10)

(Transcript of Disciplinary Hearing of Dec. 14, 2006) (emphasis added). Plaintiff then stated that when the nurse entered, "she just looked at me and said I refuse to talk to him and walked off." *Id.* It is clear from plaintiff's own testimony that shortly before defendant Anthony came into the room, plaintiff was telling the guards that "nothing" was wrong, and he did not need to see the nurse. It is thus, possible that when defendant Anthony came into the room, plaintiff did refuse to speak with her or answer her questions.

**4. *Excessive Force***

The Second Circuit has recently discussed the analysis of a claim for use of excessive force. *Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at 268 (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham,* 490 U.S. at 394)) (internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.* The subjective component focuses on the *motive* for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.* (citing *inter alia Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 7; *Whitely v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

(1973)).

**\*12** The objective component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327. The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8) (internal quotation marks omitted). However, where the defendants' use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson,* 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.* at 269. The court in *Wright* emphasized that the prohibition against cruel and unusual punishment does *not* extend to *de minimis* uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson,* 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson,* 503 U.S. at 7. The extent of the injury must be considered "in context." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003). The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321.

In this case, plaintiff has alleged an excessive use of force in the SHU on December 3, 2006 by defendants Gray, Fisher, and Farrell, while defendant Hauck stood by and watched the assault. Defendants admit that they were present during plaintiff's admission to the SHU, but they deny that they used any force whatsoever against plaintiff.

**A. Defendant Hauck**

Defendants first argue that the case should be

dismissed against defendant Hauck because plaintiff has not shown that this defendant was "personally involved" in the alleged incident, even though plaintiff claims that defendant Hauck stood at the doorway and watched the alleged assault. (Def. Memorandum of Law at 12-13) (Dkt .No. 48). Defendants argue that plaintiff has failed to show that defendant Hauck participated in, encouraged, condoned, or was even present during the alleged assault. *Id.* at 12. Defendants cite plaintiff's deposition testimony during which he stated that defendant Hauck watched the assault, but when asked whether defendant Hauck left the doorway at any time, plaintiff stated that he did not "think" that defendant Hauck left. *Id.* (citing DT at 102).

Plaintiff has not accused defendant Hauck of participating in the alleged beating. Plaintiff claims that defendant Hauck watched the assault from the door of the strip-frisk room. However, plaintiff does not need to "establish" that defendant Hauck was present during plaintiff's admission to SHU because defendant Hauck himself *admits* that he was present. (*See* Hauck Dec'l). Defendant Hauck describes in detail observing plaintiff bang his head on the wall, fall to the floor, and bang his head on the floor. (Hauck Decl. ¶ 9). The other defendants state that plaintiff did not get up until defendant Hauck ordered him to do so. (Farrell Decl. ¶¶ 8-9; Gray Decl. ¶ 12; Fisher Decl. ¶¶ 12-13). Thus, it is clear that defendant Hauck was present throughout the incident.

**\*13** While plaintiff does not claim that defendant Hauck participated in the alleged excessive use of force, he claims that defendant Hauck failed to intervene while the other officers were using excessive force. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997); *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988) (citations omitted).

An officer who fails to intervene is liable for the harm that could have been prevented, caused by the actions of the other officers, where that officer observes or has reason to know that excessive force is being used. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Liability attaches where there was a "realistic opportunity to intervene to prevent the harm from occurring." *Id.* This

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

rule for law enforcement officers extends to corrections officers. *Parker v. Fogg,* 85-CV-0177, 1994 U.S. Dist. LEXIS 1696, at *8 (N.D.N.Y. Feb. 17,1994) (McCurn, J.). An officer is excused from liability, despite his presence, if the assault is "sudden and brief," such that there is no real opportunity to prevent it. *Ricciuti, 124 F.3d at 129; Fogg,* 1994 U.S. Dist. LEXIS 1696, at *8.

Because plaintiff alleges that defendant Hauck was at the door of the strip-frisk room during the incident, and defendant Hauck admits being present during the incident, *if* excessive force had been used against plaintiff, then defendant Hauck would have been responsible for failure to intervene. Thus, this court will not recommend dismissal based on the lack of personal involvement of defendant Hauck and will proceed to consider the merits of the plaintiff's excessive force claim.

**B. Defendants Gray, Farrell, and Fisher**

As stated above, the defendants' version of the incidents of December 3, 2006 is very different from plaintiff's description. Credibility determinations and choices between conflicting versions of the events are matters for a jury and not for the court on summary judgment. *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citing *inter alia Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255). There is a very narrow exception to the rule as stated by the Second Circuit in *Jeffreys v. City of New York,* 426 F.3d 549, 553-55 (2d Cir.2005). In *Jeffreys,* the court held that a court may grant summary judgment in the rare circumstance where there is nothing in the record to support plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could believe the plaintiff's testimony. *Id.* at 554-55.

In *Jeffreys,* the Second Circuit cited with approval the district court's opinion in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998). *Jeffreys,* 426 F.3d at 555. In *Aziz,* then-District Judge Sonia Sotomayor granted summary judgment in an excessive force case, relying upon the absence of any evidence in the record that corroborated the plaintiff's version of the events, and highlighting the "many inconsistencies and contradictions

within the plaintiff's deposition testimony and affidavits." 994 F.Supp. at 470. The court in *Aziz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Id.*

**\*14** The court in *Jeffreys* also distinguished a case in which the Second Circuit reversed the grant of summary judgment in a case in which plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Jeffreys,* 426 F.3d at 554-55 (distinguishing *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997)).

This court finds that this case is one of those rare exceptions in which plaintiff's allegations are inconsistent throughout the record; there is absolutely no medical evidence to corroborate plaintiff's multiple versions of the events; and a review of the entire record shows that no reasonable person could believe plaintiff's allegations. Plaintiff's multiple versions of the events include his disciplinary hearing testimony, during which he states that defendant Gray punched plaintiff once, causing plaintiff to fall to the floor, and then defendant Gray punched plaintiff once more after plaintiff got up off the floor, causing plaintiff to fall again. (Farrell Decl. Ex. B at 9). However, plaintiff states that when he got up the second time, he complied with the frisk procedure, and that is when defendant Anthony was called. *Id.* at 10. There were no claims of any additional beating.

During the December 14, 2006 disciplinary hearing, plaintiff also admitted banging his head against the wall and on the floor. *Id.* He did state, however, that he engaged in this behavior so that the defendants would stop beating him. In his response to defendants' motion for summary judgment, plaintiff strenuously denies that he ever banged his head on the wall or the floor, stating that if he had done so, there would have been swelling or bruising to his head. (Dkt. No. 49-2 ¶ 3; 49-3 ¶ 5; 49-4 ¶ 4; 49-6 ¶ 3; 49-7 ¶ 3).[FN13] Plaintiff now claims that the tape of the disciplinary hearing was "erroneously" transcribed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

to the extent that it contradicts his statement that he did not bang his head on the wall or the floor. (Dkt. No. 49-3 ¶ 5).

> FN13. Plaintiff has responded in opposition to each defendant's declaration. These citations are to plaintiff's affidavits in response that are all filed under docket number 49.

The court notes, however, that plaintiff's claim that the disciplinary hearing was "erroneously" transcribed is completely implausible because his testimony at the hearing regarding the issue of him banging his head is not simply one sentence that could have been misheard. (Farrell Decl. Ex. B at 10-11). Plaintiff told the hearing officer an entire story regarding the reason that plaintiff banged his head, and even stated that "it didn't hurt because they stopped beating on me and then took me back to my cell." *Id.* at 11. Defendant Farrell testified at the disciplinary hearing, and plaintiff simply asked him "wasn't [sic] you the one that slapped me on my head when I was on the wall." *Id.* at 22. Defendant Farrell denied slapping plaintiff, but plaintiff never asked about any another conduct by defendant Farrell.

**\*15** By the time that plaintiff filed his grievance on December 15, 2006, he alleged that defendant Gray physically attacked plaintiff and defendants Farrell and Fisher kicked and slapped plaintiff while he was "on the floor." (Farrell Decl. Ex. C at 5).[FN14] However, when plaintiff was interviewed by Lieutenant Schaller for the grievance investigation, plaintiff stated that he was struck once in the rib area by defendant Gray, but "he was not struck by any other staff members however Sgt. Fisher and Officer Farrell were also present in the room and ... Lt. Hauck was located in the doorway...." (Farrell Decl. Ex. D at 16) (grievance materials). The grievance was denied by the Superintendent because no evidence of physical force was found.[FN15] *Id.* at 6.

> FN14. Defendants have not numbered the pages of Exhibit C of the Farrell Declaration. Thus, the page referred to by the court is simply the fifth page of the exhibit, not counting the certification of the documents.

> FN15. In a memorandum from Captain Leghorn to K. Lucas, the Inmate Grievance Resolution Committee Supervisor, Captain Leghorn points out the inconsistency between plaintiff's written grievance and his interview with Lieutenant Schaller. (Farrell Decl. Ex. D at 15).

By the time that plaintiff filed his complaint in this federal action, he stated that before the alleged assault, defendant Gray put on a pair of leather gloves, plaintiff was punched twice by defendant Gray, and that after plaintiff fell to the floor, he was slapped in the head and kicked in his back, buttocks and leg area by defendants Farrell and Fisher. Compl. ¶ 4. In the complaint, plaintiff added that when defendant Fisher told plaintiff to get up, plaintiff stated that he could not get up because of his back injury, but that defendant Fisher told plaintiff he did not have a back injury and kicked plaintiff again. Comp. ¶ 5. Defendant Fisher told defendant Farrell to make plaintiff stand up, and defendant Farrell dragged plaintiff across the floor causing his elbow to be bruised and "slammed" plaintiff against the wall. *Id.* The complaint continues, stating that after plaintiff put on his SHU clothes, defendant Farrell "yanked my underpants ... up so hard that it bruised my tail bone and slapped me in the back of the head." *Id.*

By the time that plaintiff was deposed in this action, plaintiff claimed that defendant Gray also had kicked plaintiff. (DT at 60, 66). Plaintiff testified that "other people" started kicking him, and that they kicked him in his back and shoulders. (DT at 62-63). Plaintiff stated that defendants Gray, Farrell, and Fisher kicked and punched plaintiff while he was on the floor. (DT at 64). Plaintiff testified that defendant Gray kicked plaintiff more than five times. (DT at 65). Plaintiff stated that defendant Fisher hit plaintiff on the head while he was down on the floor, and that the defendants kicked plaintiff hard for "two or three minutes." (DT at 68). Defendant Fisher also slapped plaintiff on the head and told him to get up. (DT at 69).

At plaintiff's deposition, he did not mention the bruised tail bone. He simply stated that defendant Farrell dragged plaintiff out of the corner, lifted him up by the waist of his pants and his shirt, and pushed plaintiff up

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

against the wall. (DT at 71). At his deposition, plaintiff also elaborated further on the beginning of the story. (DT at 52-56). Plaintiff testified that after defendant Gray punched plaintiff the first time, defendant Farrell told plaintiff to put his hands back up on the wall, and plaintiff told defendant Farrell that "if CO Gray hit me again, I'm going to take my hands back off the wall." (DT at 54-55). Plaintiff stated that he was coming back off the wall and that he was not going to "be on the wall while he keep [sic] punching me like I'm a punching bag." (DT at 55). Plaintiff stated that he intended to defend himself, with his fists if necessary. *Id.* Then plaintiff states that he put his hands back up on the wall, and defendant Gray punched him again. *Id.* Plaintiff did not make any of these statements earlier.

**\*16** As an exhibit, defendants have also included the confidential testimony of the psychologist from the Office of Mental Health (OMH), Ed Rudder, who recommended placing plaintiff on the suicide watch on December 3, 2006 after he was told that plaintiff had told the officers that he would be attempting to commit suicide that night.[FN16] (Roberts-Ryba Aff. Ex. C). Psychologist Rudder interviewed plaintiff on December 4, 2006. *Id.* Plaintiff states in his complaint that when he was interviewed by Psychologist Rudder, plaintiff told him that the officers lied when they reported that plaintiff was threatening suicide. Compl. ¶ 6. Psychologist Rudder testified that plaintiff denied making the suicidal statements, said that he was fine, but that "there must be *some misunderstanding* of some nature." *Id.* (emphasis added). Later plaintiff told Psychologist Rudder that the suicide statement was either a "misunderstanding" or "perhaps it was a fabrication." *Id.*

> FN16. Psychologist Rudder states that he was called at home on Sunday, December 3, 2006, and recommended one-on-one suicide watch until the next morning when Psychologist Rudder went to plaintiff's cell to interview him regarding plaintiff's alleged statement. (Roberts-Ryba Aff. Ex. C at 2).

Psychologist Rudder also testified that he asked the plaintiff about the notation in the log book, stating that plaintiff was banging his head and later that night, was

hiding under his bed. *Id.* Psychologist Rudder testified that plaintiff "reported that he was probably feeling frustrated and wanted to get a little attention and stated he was probably just being a *little dramatic* with his behavior to get some attention...." *Id.* (emphasis added). Plaintiff also told Psychologist Rudder that plaintiff was annoyed that he had been placed in SHU and felt that the placement was unjust. *Id.*

There was absolutely no discussion of an assault or plaintiff being injured. In fact, based on the discussion that plaintiff had with Psychologist Rudder, it appears that plaintiff reacted with frustration and anger about being placed in SHU, but plaintiff attempted to make it clear that there was nothing wrong with him mentally. *Id.* Plaintiff appears to have adjusted his statements based upon the individual to whom he was speaking. Clearly, plaintiff no longer wished to be on suicide watch because that involved a deprivation of clothing and belongings, thus, when he spoke to Psychologist Rudder, he stated that everything was fine and that the "suicide" statement was either a "misunderstanding" or a "fabrication."[FN17] When Psychologist Rudder asked plaintiff why he was banging his head, plaintiff did not tell him that it was so that the defendants would stop beating him as he alleged during the disciplinary hearing, rather, plaintiff stated that he was feeling frustrated and annoyed that he had been placed in SHU unjustly.

> FN17. It is unclear from the testimony who plaintiff is stating fabricated the suicide allegation. However, for purposes of this motion, the court will assume that plaintiff was claiming that one of the defendants fabricated that statement, rather than as an admission that plaintiff fabricated the desire to commit suicide.

All of the above evidence, together with the fact that plaintiff had no injuries other than a scraped elbow, shows that this is one of those actions in which a reasonable jury could *not* find in plaintiff's favor. It is completely implausible that if the events happened as plaintiff currently states, that he would not have had more severe injuries or at least some bruising other than a red mark that disappeared in a few days.[FN18] At his deposition, plaintiff alleged that the defendants kicked him hard and punched

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

him all over his body, from his legs to his back and shoulders, for a period of **two to three minutes.** (DT at 68). Plaintiff claimed that defendant Gray, alone, kicked him more than five times while plaintiff lay on the floor, a claim that plaintiff did not make in the complaint. (DT at 65).

> FN18. The court notes that the SHU Log Book indicates that plaintiff refused to have his pictures taken at 7:50 p.m. on the day of the incident. (Fisher Decl. ¶¶ 24-26 & Ex. B at 7). Defendant Fisher states that after Nurse Nordé informed defendant Fisher that plaintiff was claiming to be injured, defendant Fisher immediately obtained the camera to take pictures, but plaintiff refused. (Fisher Decl. ¶ 24). The pictures were taken on December 4, 2006 at approximately 11:00 a.m. (Fisher Decl. ¶ 27 & Ex. C).

**\*17** Even assuming that plaintiff may have been treated roughly in an attempt to get him up off of the floor as he was hitting his head, causing the scrape on plaintiff's elbow,[FN19] rough treatment does not rise to the level of a constitutional violation. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 674-75 (S.D.N.Y.2000) (citing cases in which *de minimis* uses of force did not rise to the level of constitutional violations). It appears that any conduct that may have resulted in plaintiff's elbow injury was justifiable in an attempt to get plaintiff to stand. Plaintiff's versions of the events are simply at odds with each other and at odds with the medical evidence. Plaintiff's statement to the psychologist is consistent with the statements made by the defendants, that plaintiff behaved the way he did because he was frustrated and angry over being placed in SHU for something that he did not think was justified.[FN20] Thus, based on all of the evidence, this court would recommend dismissal of the complaint as against defendants Gray, Farrell, Fisher, and Hauck.[FN21]

> FN19. It is actually unclear how or when the scrape on plaintiff's elbow was caused, but the court will assume for purposes of this motion that plaintiff's elbow was somehow scraped during the incident.

> FN20. Amazingly enough, plaintiff states in his complaint that the fact that he had no documented mental disorders poses the question why he would "allegedly" bang his head against the wall at numerous times during the pat frisk. Compl. ¶ 7. He refers to this allegation as "utterly ridiculous." *Id.* Plaintiff answered his own question at the disciplinary hearing and in his statement to the psychologist. The court understands that the psychologist testified "confidentially" at the disciplinary hearing, however, the plaintiff cannot use his confidential statements, yet not allow the rest of the statements to be discussed.

> FN21. Since there was no excessive force, defendant Hauck cannot be found liable for failure to intervene.

**5.** *Pattern of Civil Rights Violations*

Plaintiff states that his second cause of action is a "pattern of civil rights violations ..." Compl. at 5. Plaintiff argues that the defendants "made their own Rules on Procedures and Practices which involved a pattern of anti-civil rights activity in the Special housing unit are [sic] causing Plaintiff physical injury and denying Medical attention." *Id.* Defendants argue that the only civil rights violation plaintiff alleges is the incident on December 3, 2006, and that "[b]y definition, on event cannot constitute a pattern." (Dkt. No. 48, Memo. at 24).

Plaintiff has not alleged any facts relating to any alleged constitutional violations other than the incident on December 3, 2006. Plaintiff's allegations of a pattern of civil rights abuses are merely conclusory allegations. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.). Since this court has recommended dismissal of the Eighth Amendment claims for denial of proper medical treatment and excessive force, plaintiff's conclusory claim of a "pattern" of civil rights violations must also be dismissed.

**7.** *Conditions of Confinement*

It is unclear whether plaintiff is claiming that the

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

conditions of his confinement during the suicide watch were unconstitutional. He states in his complaint that he was placed in a cell with a pad, but no mattress and the lights were very bright.[FN22] Compl. ¶ 5. Plaintiff states that he was given "something like padding" to wear and was refused any toilet paper. Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment standard for conditions of confinement is similar to that for medical care.

> FN22. Plaintiff states that they took his tinted glasses away, which made the bright light even more uncomfortable.

**\*18** As in the medical care and excessive force analyses, there is an objective and a subjective prong to the Eighth Amendment analysis with respect to conditions of confinement. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Under the objective prong, the plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* In order to be sufficiently serious in a "conditions of confinement" case, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

In this case, plaintiff told defendant Fisher that plaintiff would be committing suicide, so plaintiff was placed on a one-on-one suicide watch.[FN23] The suicide watch involves depriving the inmate of his regular clothing and belongings. Even assuming that plaintiff's allegations regarding the conditions are completely true, the deprivation that he suffered would not rise to the level of a constitutional violation. Plaintiff was deprived of the regular mattress and his clothing overnight.[FN24] Plaintiff himself states that his belongings, including a mattress, sheets, and a blanket were returned to him the next day, although not as quickly as he would have liked. Compl. ¶ 7. The hours that plaintiff was without these materials

simply did not deny plaintiff the "minimal civilized measure of life's necessities." [FN25] Thus, assuming plaintiff is attempting to make an Eighth Amendment claim regarding the conditions of his confinement for one day, any such claim may be dismissed.

> FN23. It should be noted that it was Psychologist Rudder that recommended the suicide watch, based upon the notification that plaintiff had indicated that he would commit suicide that night. (Fisher Decl. Ex. B at 2) (SHU Log Book for 10:55 a.m. 12/3/06). This is corroborated by the confidential testimony of Psychologist Rudder. (Roberts-Ryba Aff. Ex. C at 2).

> FN24. Plaintiff also alleges that he was denied toilet paper. Even if this were the case, the denial of toilet paper overnight for one night does not rise to the level of a constitutional violation. The SHU Log Book indicates that plaintiff was removed from the "special watch" at 9:00 a.m. on December 4, 2006. Fisher Aff. Ex. B at 4. The Log Book also indicates that "Mental Health" was on the unit to see plaintiff at 9:29 a.m., and that the one-on-one watch for plaintiff was "finished" at 10:28 a.m. on December 4th. *Id.* at 9.

> FN25. In fact, if plaintiff had actually been suicidal, it could have been a substantial risk to leave him in his cell with materials that he could use to harm himself.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

N.D.N.Y.,2009.

Slacks v. Gray
Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

### *REPORT-RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. FACTUAL AND PROCEDURAL SUMMARY

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

> FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

> FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

> FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

> FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two

grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizability 14 of the claim. [FN15]

> FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted). *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice; *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

FN17. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the

strongest arguments that they suggest."[FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN25]

FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir.Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Weissman/Richards Health Care**

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

*1. Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer, 511 U.S. at 835; Ross v. Giambruno, 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105-06.* Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003)* ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance, 143 F.3d at 703* (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord, 535 F.Supp.2d 373, 385 (S.D.N.Y.2008)* (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance, 143 F.3d at 704.*

## 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to

receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595

(S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

## 2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

## 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

> The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

> [FN45.] The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

### 2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[FN47] (Dkt. No. 92-10 at 31-32.)

> FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

> FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I

have not addressed Defendants' argument regarding class-based animus.

#### a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

#### b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at \*5, 1999 WL 151702, at \*2 (W.D.N.Y. Mar.17, 1999). "This doctrine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

    FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y.

March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d

1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Defendants Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

procedural due process claim at issue in *Freeman." Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

**b.** *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygienic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygienic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

**5.** *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

> FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

### D. Disciplinary Hearing/Sentence

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

### 1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." <sup>FN53</sup> (Dkt. No. 1 ¶ 35.)

FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinness,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.<sup>FN54</sup>

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng*, 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia*, *Jackson*, 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin*, 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kuhlman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body

itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.*; *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

*31 **ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be *GRANTED IN PART AND DENIED IN PART;* and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

*32 Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.